IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TRANSPECOS FOODS, L.P. | § | Case No. |
| | § | Chapter 11 |
| Debtor. | § | |

## DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING SECURED POST-PETITION FINANCING, (II) GRANTING SECURITY INTERESTS AND ACCORDING SUPER-PRIORITY ADMINISTRATIVE CLAIM STATUS, (III) AUTHORIZING USE OF CASH COLLATERAL, AND (IV) SCHEDULING FINAL HEARING

TO THE HONORABLE H. CHRISTOPHER MOTT, UNITED STATES BANKRUPTCY JUDGE:

TRANSPECOS FOODS, L.P., debtor-in-possession in the above-referenced Chapter 11 case (the "Debtor") moves this Court pursuant to sections 105(a), 361, 362, 363, 364, 507 and 1146 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 fo the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Local Bankruptcy Rule 4001, for entry of interim and final orders in substantially the form attached hereto as Exhibit A (I) authorizing the Debtor to obtain post-petition financing and granting security interests as provided herein on a secured and super-priority basis, (II) authorizing the Debtor's use of cash collateral as that term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), (III) providing adequate protection under sections 361 and 363 of the Bankruptcy Code, and (IV) approving the form of notice of and scheduling of a final hearing pursuant to Bankruptcy Rule 4001.

### Jurisdiction

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

## Factual Background

A. <u>The Bankruptcy Case</u>

2.      On June 9, 2011 (the "<u>Petition Date</u>"), the Debtor filed its voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (as amended, the "<u>Bankruptcy Code</u>"). The Debtor continues to operate its business and manage its assets as debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

3.      No trustee or examiner has been appointed in this case, nor has an official committee of unsecured creditors been established.

B. <u>The Debtor's Property and Assets</u>

4.      The Debtor's principal assets consist of (a) land and building located near Interstate 20 in Pecos, Texas, (b) inventory used in the food processing business, (c) equipment used in the food processing business, (d) accounts receivable generated by the food processing business, and (e) contract rights on the purchase and delivery sides of the food processing business.

C. <u>The Debtor's Secured Indebtedness</u>

5.      Commencing in July 2002, the Debtor borrowed funds on multiple occasions from City Bank of Pecos located in Lubbock, Texas. The outstanding balances on the four (4) indebtednesses to City Bank of Lubbock are $2,968,131.04, $634,000.00, $1,149,860.85 and $1,023,685.47. The aggregate sum is $5,775,677.20. This indebtedness is secured by a blanket lien on all assets of the Debtor.

6.      On August 10, 2008, the Debtor  borrowed funds from 4B Pecos Economic Development Foundation. The outstanding balance is $462,000.00 and is secured by liens on certain specified pieces of equipment.

7.      On February 8, 2011, the Debtor borrowed approximately $8,561,739 from RDP 11, LLP located in Mason City, Iowa. The current balance on that note is $8,561,739.00. The loan was secured by a blanket lien on all assets excluding real estate (land and building).

Simultaneously, the Debtor borrowed approximately $2,268,261 from RDP 11, LLC, secured by the same collateral. The balance on this note is $2,268,261.00.

8.  TMF Sub CDE 1, LLC of Dallas, Texas loaned the Debtor approximately $12,795,000.00 between March 29, 2010 and October 2010. The borrowing took the form of three (3) promissory notes secured by a blanket lien on all assets except real estate (land and buildings). The outstanding balances on the three (3) promissory notes are $9,498,180.00, $2,996,820.00 and $300,000.00. Thus, the complete balance is $12,795,000.00 on the Petition Date.

9.  As of the Petition Date, the Debtor was also a party to lease/lease-purchase contracts covering software, equipment, VEMAG robot and forklifts.

10.  In addition to the secured debts described above, the Debtor believes that there might be vendors who provided unpaid goods and services in connection with purchases of inventory (farm goods) by the Debtor and who have filed (or have the right to file) under applicable federal law (PACA - Perishable Agricultural Commodities Act) and state law liens for the materials furnished.

C.  Events Leading Up to the Chapter 11 Filing

11.  TransPecos Foods is having difficulty meeting its financial obligations as a result of sales that have fallen short of the 2010 business plan. The shortfall is due to an industry wide shortage of a primary component for its mozzarella stick business. Historically, there have been four key suppliers of mozzarella cheese sticks for the industry. One of the four suppliers went out of business during 2010 and while this tightened availability there was adequate capacity to serve the market. During the second half of 2010 one of the remaining three supplier's processing line had a major mechanical failure and the company apparently elected not to invest in the repair and withdrew from the category. Also during this time frame, Pizza Hut had launched their "stuffed crust pizza" with great success and this pizza utilizes mozzarella sticks which further exacerbated supply availability. The Debtor was promised on numerous occasions

by both remaining suppliers that they would honor orders but as time passed it became clear this was not going to happen. In spite of the Debtor's best efforts to identify alternative suppliers, it has not been able to secure an alternate source and therefore has forfeited this category since the start of 2011. The Debtor anticipates that the industry shortage will not be corrected in the foreseeable future and will continue to cause a shortfall to the 2011 business plan approximating $300,000 per month or approximately 30% of its budgeted sales.

12. The Debtor has taken steps to correct this situation by purchasing a processing line (the "VEMAG Machine") that will allow it to make the raw material component necessary to regain business in the mozzarella stick category. This line was delivered in May 2011 and will in now fully operational. The Debtor utilized $40,000 of the NMTC funds as a down payment on this line and was able to finance the balance through the vendor. Unfortunately, the lost mozzarella business has created a severe short term cash shortfall due to the lost margin, as well as, strained relationships with its customers.

13. Separately, the Debtor has taken several steps to preserve cash where possible:
      – TMF Sub CDE I, LLC- has verbally agreed to defer interest payments into the second half of 2011 on the original $12.795 million.
      – Separately the Debtor has been able to arrange payment plans with a range of vendors to further preserve cash.
      – City Bank – Debtor is presently sixty (60) days past due on the City Bank notes.

14. The Debtor has actively sought additional investors to provide required funds for Capex and Working Capital in support of the 2011 budget and strategic growth plans. To the point, the Debtor has had conversations with Akoyo Partners (who already has ownership in a food company). The Debtor has also approached ConAgra to introduce the idea of a buyout to allow them a strategic opportunity to have a captive production facility. As of this filing, discussions with these potential investors have ceased.

15. The impact is twofold - the Debtor has and will continue to need to supplement its

working capital with NMTC funds to ensure that it is able to maintain terms with key suppliers. In order to address these challenges, the Debtor requires a deferral of Interest Payments to TMF Sub CDE I, LLC and RDP 11, LLC. Specifically, the Debtor requires that payment of the Interest be deferred until September 31, 2011 including a waiver of any stipulated late penalty.

Current cash flow from operations is averaging a negative $250,000 per month. Based on the current 13 week cash flow model it is expected that this burn rate will continue at this pace through mid-June. The current year forecast indicates that the Debtor will require an additional cash infusion of $650,000 peaking during September 2011. The Debtor requests authorization to borrow up to $650,000 during the period from the Petition Date until September 30, 2011.

16. Based on its inability to sell or encumber assets, its lack of liquidity, and the various lawsuits and corresponding attachment and collection efforts by various creditors and shareholders, the Debtor was forced to seek bankruptcy protection.

D.    The DIP Lender's Connections to the Debtor

17. As of the Petition Date, City Bank of Texas (hereinafter the "Lender" or "CBL") contends that is holds valid, enforceable, and allowable claims (as defined in Section 101 of the Bankruptcy Code) against the Debtor, pursuant to the following loan documents (the "Pre-Petition Indebtedness Documents"):

> (i)   City Bank loan number 3650700: real estate note; deed of trust; change in terms agreement;
>
> (ii)  City Bank loan number 3085349: note & security agreement; guaranty agreement;
>
> (iii) City Bank loan number 3085506: note & security agreement; guaranty agreement; and
>
> (iv)  City Bank loan number 3089828: note & security agreement; guaranty agreement.

E.    The Debtor's Negotiations to Acquire Post-Petition Financing

18. An immediate need exists for the Debtor to obtain funds and financial

accommodations with which to meet its payroll and other necessary, ordinary course business expenditures, acquire goods and services, administer and preserve the value of its estate, and maintain adequate cash balances customary and necessary for a company of this size in this industry to maintain customer confidence. The ability of the Debtor to finance its operations requires the availability of working capital, the absence of which would immediately and irreparably harm the Debtor, its estate, and its creditors.

19.     The Debtor is unable to obtain financing in the form of unsecured credit allowable solely as an administrative expense under Section 503(b)(1) of the Bankruptcy Code or solely in exchange for the grant of "super-priority" administrative claim status under Section 364(c)(1).

20.     As part of the Debtor's analysis in considering a chapter 11 alternative, the Debtor has determined that it will require post-petition financing to get through the first 90 days of the bankruptcy, which is the anticipated point that one or more asset sales would be consummated. Given the Debtor's financial condition and capital structure, the Debtor believes that it could not obtain unsecured post-petition financing allowable solely as an administrative expense under Section 503(b)(1) of the Bankruptcy Code or solely in exchange for the grant of "super-priority" administrative claim status under Section 364(c)(1). In addition, the Debtor believes that it could not obtain post-petition financing secured by a first priority lien on the Debtor's unencumbered assets (if any) or a subordinated lien on the encumbered assets. The Debtor approached several reputable lenders concerning their need for post-petition financing, but no third party lender indicated a willingness to lend money to the Debtor on an unsecured basis or on a priority lien basis. The DIP Lender (City Bank of Texas)was the logical and only choice available to the Debtor for obtaining post-petition financing during their Chapter 11 case.

21.     The Debtor requires post-petition financing in order to maintain sufficient availability to pay suppliers and other creditors that are vital to preserving the value of Debtor's estate and maintaining operations. All obligations coming due before the final hearing on the Motion must be paid to avoid immediate and irreparable harm to the Debtor's estate.

22.     The Debtor's decision to obtain the post-petition financing through borrowing or payment deferrals is a result of the exercise of sound and reasonable business judgement. The proposed financing is necessary, essential and appropriate for the continued operations of the Debtor's business and preservation of the bankruptcy estate. Given the circumstances of this case, the terms of the DIP Lender financial arrangements are fair, reasonable and adequate and the proposed financing is in the best interest of the Debtor's estate. No better offers, commitments or timely proposals were presented to the Debtor and the Debtor reasonably believes that no alternative financing is available on any other basis. Accordingly, the Debtor is authorized to obtain credit under §364(c)(1), (2) and (3) and 364(d) of the Bankruptcy Code.

23.     The ability of the Debtor to finance its operation and the availability of sufficient working capital through the incurrence of indebtedness from borrowed money and other financial accommodations is vital to the Debtor's ability to preserve and maintain its going concern value. The relief requested in this Motion is necessary, essential, and appropriate for the continued operation of the Debtor's business and the preservation of its bankruptcy estate.

### Offer of Adequate Protection

24.     The Debtor's offer of adequate protection, only in the instance Lender holds a valid, enforceable, perfected lien on accounts receivable and/or cash, for both the interim and final orders is as follows:

a)     Lender will be granted a replacement lien in cash, subject to a determination by the Court that Lender holds a fully perfected, enforceable pre-petition lien on cash, with the exceptions and provisions that follow, with the same priority as the Lenders' individual pre-petition liens, if any, and to the extent that the value of Lenders' collateral, on an aggregate basis, diminishes as a result of the use of Cash Collateral authorized by this Court;

b)      The replacement liens will not prime any validly attached and properly perfected lien held by a third party on specific property of the Debtor as of June 9, 2011, the Petition Date;

c)      The replacement lien will not attach to chapter 5 actions of the Debtor or the proceeds of the recovery upon such actions;

d)      Except for post-petition cash generated from operations, the replacement lien will not attach to any unencumbered property of the Debtor, if any, or the proceeds of any sale of any unencumbered property, and the proceeds from any sale of any unencumbered property shall be deposited into a separate unencumbered account and, absent further order of the Court, shall not be subject to the replacement lien of the Lender;

e)      The replacement lien will attach only to the extent that cash used by the Debtor is ultimately determined by the Court to be Cash Collateral of Lender;

f)      The replacement lien will not apply to any reduction in cash value caused from the payment of an expense that is later surcharged against Lender's collateral based on Section 506(c) of the Bankruptcy Code;

g)      The cash will be used to continue the operations of the Debtor and therefore maintain the going concern value of the aggregate of the Lender's collateral; as such, the use of cash will be regulated by a pre-approved budget to assure that appropriate operating expenses are being paid and that no inappropriate expense is paid;

h)      The cash will be used in part to maintain insurance on the Debtor's collateral and all other of the Debtor's assets;

i)      The Debtor will provide to Lender monthly cash flow reports, monthly operating reports, and monthly financial statements and schedules. These

reports will allow Lender to vigilantly monitor their collateral position and seek relief should it become necessary; and

j) The use of Cash Collateral may be terminated by the Court on motion, after notice and hearing, if the Court determines that Lenders are no longer adequately protected.

25. The Debtor believes that the terms of the Interim Cash Collateral Order are fair and reasonable under the circumstances. The Debtor asserts that the aggregate value of Lender's alleged cash collateral will not diminish as a result of the use of cash in this case. The value of Lender's alleged non-cash collateral – the equipment , land and building – will not diminish during the life of this case. The value of the Lender's alleged interest in cash may fluctuate, but such value should not diminish, other than minimally, over the next 6 to 12 months, the projected life of this case.

26. The Debtor believes that the Lender is entitled to the protections set forth in the proposed Interim Cash Collateral Order. The adequate protection provisions have been drafted to provide protection without taking undue or inappropriate value from the Estate and its unsecured creditors.

27. Given that the interests of Lender will be adequately protected, it is in the best interest of the Debtor, its Estate, and all of its creditors for the Debtor to be able to continue operations and that the Debtor be authorized to use Cash Collateral, even without the Lenders' consent.

### Relief Requested

28. Debtor seeks, among other things, the authority to enter into the DIP Credit Facility. Debtor requests that the Court enter interim and final orders pursuant to Bankruptcy Code sections 105(a), 361, 362, 363, 364, 507 and 1146 (the "Interim Order" and the "Final Order" collectively the "Financing Orders"):

a. authorizing the Debtor to (a) obtain post-petition financing from the DIP Lender up to the maximum availability in the form of revolving advances and collection of accounts receivable and (b) grant the DIP Lender security

interests in the DIP Collateral pursuant to 11 U.S.C. § 364(c)(2) and (3) and super-priority administrative claims pursuant to 11 U.S.C. § 364(c)(1);

b. authorizing the Debtor's use of cash collateral of the DIP Lender;

c. modifying the automatic stay, for cause under 11 U.S.C. § 364(d)(1), to the extent necessary for the DIP Lender to effectuate the terms of the Debtor's adequate protection offer and for the DIP Lender to enforce its rights thereunder; and

d. scheduling a final hearing pursuant to Bankruptcy Rule 4001(c)(2) no earlier than 15 days after service of the Motion, but no later that 30 days after the Petition Date, at which the Debtor will seek entry of a Final Order;

The requested relief is necessary for the Debtor to meet their post-petition working capital needs and to preserve the value of its bankruptcy estate for the benefit of the creditors.

## Taxes

29. Pursuant to Section 1146(c) of the Bankruptcy Code, the pledging of any collateral, or the delivery of any security interests or other instruments or transfer, the furnishing of any promissory note(s) or other evidence of indebtedness, in furtherance of, or in connection with the DIP Credit Facility, including (i) any mortgages, security agreements, collateral assignments, or other similar agreements or (ii) evidence or documents of perfection (including transfers or assets to and by DIP Lender in connection with enforcement of the Financing Order) should not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax. See generally In re T.H. Orlando Ltd., 391 F. 3d 1287 (11th Cir. 2004) (broad interpretation of Section 1146(c)).

**Law and Argument**

A.   Debtor's Adequate Protection Offer Satisfies the Standards of Bankruptcy Code Section 364.

30.   The Debtor is unable to procure credit required to fund its post-petition business operations in the form of unsecured credit with an administrative expense priority under the Bankruptcy Code section 503(b)(1).

31.   The Debtor, therefore, had no choice but to seek credit on a secured basis.  The procurement of post-petition credit by a debtor-in-possession is governed by Bankruptcy Code section 364.  In relevant part, the section provides:

(c)   If the [debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, my authorize the obtaining of credit or incurring of debt –

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien ; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

32.   A debtor seeking financing under Bankruptcy Code sections 364(c) must make a reasonable effort to seek other sources of unsecured credit available but is not required to seek credit from every possible source," and is granted considerable deference in acting in accordance with its business judgement.  In re Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085 (4th Cir. 1986): In re Ames Department Store, Inc., 115 B.R. 34 (S.D.N.Y. 1990).  The Debtor does not have any other financing source to fund the amounts needed to sustain the Debtor's business during the chapter 11 case.  Because the Debtor has a need for the financing to preserve and enhance its going concern value, the Debtor has satisfied its burden of showing the unavailability of alternative unsecured financing.

33.   Having determined that post-petition financing was available only under

Bankruptcy Code section 364(c), the Debtor negotiated the DIP Credit Facility at arms' length and in accordance with its sound business judgment. In negotiating debtor-in-possession financing arrangements, courts "permit debtors in possession to exercise their basic business judgement consistent with their fiduciary duties." Id. at 38. Courts will evaluate the facts and circumstances of a debtor's case, and will accord significant weight to the necessity for obtaining financing so long as it does not run afoul of the provisions of an policies underlying the Bankruptcy Code. See, e.g., In re Snow Shoe., 789 F.2d 1085 (4th Cir. 1986) (approving post-petition financing necessary to sustain seasonable business); Ames, 115 B.R. at 40 ("Cases consistently reflect that the Court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgement to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties of its interest."). Courts generally will not override the debtor's prudent and responsible exercise of its business judgement consistent with its fiduciary duties to the bankruptcy estate and its creditors in negotiating an appropriate financing package. See In re Simasko Prod. Co., 47 B.R. 444 (Bankr. D. Colo. 1985) (noting that business judgement should be left to the boardroom and not to the bankruptcy courts).

34. The availability of credit under the DIP Credit Facility will provide Debtor's vendors and suppliers the necessary confidence to resume ongoing relationships with the Debtor. Accordingly, this Court should authorize the Debtor to obtain post-petition financing pursuant to the terms contained in the proposed final financing order.

35. The terms and conditions of the DIP Credit Facility are fair and reasonable and were negotiated by the parties in good faith and at arm's length. Accordingly, the DIP Lender should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of the Post-Petition Financing.

B.  The Court May Permit the Debtor to Use Its Pre-Petition Cash Collateral

36. The Debtor's use of property of its estate is governed by Section 363 of the

Bankruptcy Code, which provides in pertinent part that:

> If the business of the Debtor is authorized to be operated under section...1108...of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or hearing.

37.    A debtor in possession has all the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

38.    Section 363(c)(2) of the Bankruptcy Code establishes a special requirement with respect to "cash collateral", by providing that the trustee or debtor in possession may not use, sell or lease "cash collateral" under subsection (c)(1) unless:

    a.    each entity has an interest in such collateral contents;

        or

    b.    the court, after notice and hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

"Cash Collateral" is defined as, "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

39.    Here, the party having a lien on cash collateral has consented to such use in accordance with terms of the current loan documents, subject to the terms and conditions set forth in this Motion and thus such use us authorized under Section 363(c)(2).

40.    These funds may be subject to a PACA Trust lien of approximately $400,000 and therefore not property of the estate for the Debtor to use as cash collateral.

### Conclusion

Based on the foregoing, the Court should enter the Financing Orders (a) granting the Debtor authority to enter into the DIP Credit Facility and grant security interests thereunder and approving all of the terms and conditions of the DIP Credit Facility, (b) authorizing the Debtor's

use of Cash Collateral, (c) modifying the automatic stay, (d) scheduling a final hearing , and (e) granting the Debtor such other legal and equitable relief to which it is entitled.

Dated: June ___, 2011

Respectfully submitted,

**JAMES & HAUGLAND, P.C.**
P.O. Box 1770
El Paso, Texas 79949-1770
Telephone: 915-532-3911
Facsimile: 915-541-6440

By: _____
WILEY F. JAMES, III
State Bar No. 10554300
Attorney for the Debtor In Possession

## CERTIFICATE OF SERVICE

I certify that on this 9th day of June, 2011, a true and correct copy of the foregoing was served upon the following parties listed on the Court's ECF Noticing System via electronic means. I further certify that on this 9th day of June, 2011, a true and correct copy of the foregoing was served, regular, first class mail upon the following parties:

U.S. Trustee's Office
615 E. Houston, Suite 533
P.O. Box 1539
San Antonio, TX 78295-1539

Gary Candy
TPF GP, LLC
2 Spence Road
Boerne, TX 78006

Bruce E. Toppin, III
Kennedy, Toppin & Sutherland, LLP
112 East Pecan Street, Suite 800
San Antonio, Texas 78205

Michael Hicks
Mullin, Hoard & Brown, LLP
1500 Broadway, Suite 700
Lubbock, TX 79401

E. Frank Childress
Robert Del Priore
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
165 Madison Ave., Suite 200
Memphis, TN 38103

and to all of the parties listed on the attached matrix pursuant to L.R. 9013(c)(1)(B)

WILEY A. JAMES, III

Barker Produce
P.O. Box 611
Mesilla Park, NM  88047

National Onion, Inc.
P.O. Box 7206
Las Cruces, NM  88006

Daymon Worldwide Design
P.O. Box 3801
Carol Stream, IL  60132

DCS Sanitation Management
P.O. Box 630448
Cincinnati, OH  45263

Bybee Foods, LLC
P.O. Box 2508
Pasco, WA  99302

Hilbig Services, Inc.
P.O. Box 460
Schertz, TX  78145

Motion Industries, Inc.
P.O. Box 849737
Dallas, TX  75284

Newlyweds Foods, Inc.
Lock Box 6327
Chicago, IL  60680

TransPecos Banks
P.O. Box 2037
Pecos, TX  79772

Stadium Funding, LLC
112 E. Pecan St.
San Antonio, TX  78205

DanHil Containers, LLC
P.O. Box 61147
San Angelo, TX  76906

Leprino Foods
1830 West 38th Ave.
Denver, CO  80211

Kennedy & Baris
112 E. Pecan, #800
San Antonio, TX  78205

Jewel Apple
P.O. Box 27
Yakima, WA  98907

Topco
P.O. Box 96002
Cincinnati, OH  60693

Agropur, Inc.
Bin No. 259
Milwaukee, WI  53288

StarTex Power
P.O. Box 4802
Houston, TX  77210

ADM Oil
P.O. Box 66838
St. Louis, MO  63166

Preferred Freezer Svcs. - Atlanta
518 Forest Pkwy.
College Park, GA  30349

Rite Stuff Foods, Inc.
P.O. Box 447
Jerome, ID  83338

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TRANSPECOS FOODS, L.P. | § | Case No. |
| | § | Chapter 11 |
| Debtor. | § | |

## <u>INTERIM ORDER UNDER 11 U.S.C. §§ 105(a), 361, 363, 364(c), AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND 9014 (1) AUTHORIZING SECURED POST-PETITION FINANCING, (II) GRANTING SECURITY INTERESTS AND ACCORDING SUPER-PRIORITY ADMINISTRATIVE CLAIM STATUS, (III) AUTHORIZING USE OF CASH COLLATERAL, AND (IV) SCHEDULING FINAL HEARING</u>

TRANSPECOS Foods, L.P. (The "Debtor), as debtor-in-possession in the above-referenced chapter 11 case, having moved on June 9, 2011 (the "Motion") for an order authorizing them to use certain Collateral, including cash collateral (the "Cash Collateral"), to incur post-petition secured indebtedness, to grant security interests and super-priority claims pursuant to sections 105(a) and 364(c)(1), (2), and (3) of the United States Bankruptcy Code, 11 U.S.C. §§ 10I-1532, as amended (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and having requested, among



EXHIBIT
74

other things, that:

(a)     the Court authorize the Debtor to use the Cash Collateral on the terms set forth herein;

(b)     the Court authorize the Debtor, pursuant to sections 105(a) and 364(c)(1), (2) and (3) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014, to obtain from City Bank Texas ("DIP Lender" ), a cash advance of up to $300,000 on an interim basis, pending a final hearing (the "Interim DIP Loan"): (i) fund ongoing working capital and general corporate needs of the Debtor during the Chapter 11 Case, (ii) pay the costs and expenses of members of the Committees as approved by the Court, and other bankruptcy-related charges as allowed by the Court, including the United States Trustee and Clerk Fees (as defined herein), (iii) pay to the Lender the fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) provided by any DIP Credit Agreement executed with the DIP Lender and the other agreements, instruments and documents executed in connection therewith (collectively, with the DIP Credit Agreement, the "DIP Credit Documents"), and (v) for such other purposes allowed under the DIP Credit Documents or existing loan agreements with the DIP Lender;

(c)     the Court order, first on an interim and then on a final basis, as set forth in the Motion, pursuant to sections 364(c)(1), (2) and (3) of the Bankruptcy Code, that the Obligations of the Debtors under the DIP Credit Documents (collectively, the "DIP Obligations")(i) be granted super-priority administrative expense status, having priority over any and all administrative expenses of the kinds specified in, or arising or ordered under, sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code, and (ii) be secured (a) under section 364(c)(2) of the Bankruptcy Code, by first priority, perfected security interests and liens in and on all of the property, assets, or interests in property or assets of the Debtor, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the Debtor's "estate" (within the meaning of the Bankruptcy Code), inventory, accounts receivable, other rights to payment whether arising before or after the

Filing Date, contracts, real properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other Intellectual Property, trademarks, trade names, all deposit accounts, all cash maintained in deposit and other accounts, all commercial tort claims; all cash and non-cash proceeds, rents, products and profits of any of the foregoing, including but not limited to the property described on Exhibit "A" hereto (all of the foregoing, collectively, the "Post-Petition Collateral"), subject and subordinate only to Permitted Priority Liens (as defined in the DIP Credit Agreement), and (b) under section 364(c)(3) of the Bankruptcy Code, by a perfected junior lien, on and security interests in all of the applicable Debtors' currently owned and after-acquired property that is subject to a Permitted Priority Lien;

(d)     the Court conduct a hearing (the "Interim Hearing") to consider approval, on an interim basis, of the post-petition financing pursuant to the DIP Credit Documents or existing loan agreements and authorizing the Debtors to obtain, on an interim basis, advances under the DIP Credit Agreement or existing loan agreements secured by the Post-Petition Collateral in an amount of up to $650,000 (the "Maximum Interim Borrowing");

(e)     the Court find, pursuant to Bankruptcy Rule 4001(c)(1), that notice of the Interim Hearing was given to (i) the Office of the United States Trustee for the Western District of Texas (the "U.S. Trustee"), (ii) the Debtor's 20 largest unsecured creditors, as identified in its chapter 11 petition, (iii) the Lender; (iv) any parties that have filed a notice of appearance pursuant to Bankruptcy Rule 2002; (v) all known secured creditors of the Debtors, and (vi) the other interested parties by virtue of the Borrowers having filed the Motion and the DIP Credit Documents on the Court's PACER System (collectively, the "Notice Parties"); and

(f)     the Court schedule, pursuant to Bankruptcy Rule 4001, a hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing the Debtor to obtain, on a final basis, DIP Advances under the DIP Credit Documents or existing loan agreements in an amount of up to the Maximum Final Borrowing;

And the Interim Hearing having been held on _____; and based upon all of the pleadings filed with the Court, the evidence presented and the arguments of counsel made at the Interim Hearing; and the Court having noted the appearances of all parties-in-interest; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court, and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate and creditors, and such relief is essential for the continued operations of the Debtor's business; and it further appearing that the Debtor has been unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(l) of the Bankruptcy Code or other secured financing on equal or more favorable terms than those set forth in the DIP Credit Documents; and upon the record herein; and after due deliberation thereon; and sufficient cause appearing therefore;

**IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED, AND DECREED THAT:**

1.      <u>Disposition</u>. The Motion is granted on an interim basis on the terms set forth in this Interim Order. Any objections to the interim relief sought in the Motion that have not previously been resolved or withdrawn are hereby overruled on their merits. This Interim Order shall be valid, and binding on all parties-in-interest and fully effective immediately upon entry.

2.      <u>Jurisdiction: Venue.</u> The Court has jurisdiction over the Chapter 11 Cases, the parties, and the Debtor's property pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of the Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.

3.      <u>Purpose and Necessity of Financing.</u> The Debtor requires the interim financing described in the Motion in the amount of $300,000 to fund, among other things, the Debtor's immediate cash requirements for working capital and general corporate needs. The Debtor is unable to obtain adequate unsecured credit allowable under section 503 of the Bankruptcy Code as an administrative expense or other financing under section 364(c) of the Bankruptcy Code on

equal or more favorable terms than those set forth in the DIP Credit Documents or exiting loan documents within the time frame required by their needs to avoid immediate and irreparable harm. A loan facility in the amount and in the manner provided by the DIP Credit Documents is not available to the Debtors, generally, without granting to the Lender, pursuant to sections 364(c)(1), (2), and (3) of the Bankruptcy Code, the following: (a) super-priority administrative expense claims with respect to all DIP Loans having priority over any and all administrative expenses of the kinds specified in, or arising or ordered under, sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; and (b) as security for all DIP Obligations, pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code, (x) first priority, perfected security interests and liens on the Post-Petition Collateral, subject and subordinate only to Permitted Priority Liens and (c) first priority, perfected security interests in and liens on all of the Debtors' currently owned and after acquired property, subject and subordinate only to Permitted Priority Liens. After considering all alternatives, the Debtor has concluded in the exercise of its

prudent business judgment that the loan facility provided under the DIP Credit Documents or existing loan documents represents the best working capital financing available to them.

4. <u>Good Cause.</u> The Debtor's ability to obtain sufficient working capital and liquidity under the DIP Credit Documents or existing loan documents is vital to the Debtor's estate and its creditors, so that the Debtor can continue to operate its business in the ordinary course and effect an orderly liquidation of its assets pursuant to a plan under section 1129 of the Bankruptcy Code and sale(s) pursuant to Section 363 of the Bankruptcy Code. The Debtor's estate will be immediately and irreparably harmed if this Interim Order is not entered. Good cause thus has been shown for the interim relief sought in the Motion.

5. <u>Good Faith.</u> The terms of the DIP Credit Documents or existing loan documents , including the interest rates and fees applicable thereto and intangible factors, are more

favorable to the Debtor than those available from alternative sources. Based upon the record before the Court, the DIP Credit Documents or existing loan documents have been negotiated in good faith and at arms-length between the Debtor and the DIP Lender (City Bank of Texas). Any DIP Loans and other financial accommodations made to the Debtor by the DIP Lender pursuant to this Interim Order and the DIP Credit Documents or existing loan documents shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Lender shall be entitled to all protections afforded thereby. The terms of the loan facility provided under the DIP Credit Documents or existing loan documents are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

6.    Authorization to Use Cash Collateral. During the term of this Interim Order and subject to the terms hereof, the Debtor is authorized to use Cash Collateral in which any party, including the DIP Lender, may have an interest, in accordance with the terms, conditions, and limitations set forth in the budget annexed hereto as Exhibit "B" (the "Budget") and otherwise pursuant and subject to the terms and conditions of the DIP Credit Agreement or existing loan documents and this Interim Order. To the extent that any such party does not consent to the use of any item of the Post-Petition Collateral, the interests of such party are hereby deemed adequately protected.

7.    Interim Borrowing. Subject to the terms and conditions of this Order and the DIP Credit Documents or existing loan documents including, without limitation, the covenants and Budget as specified in the DIP Credit Documents or existing loan documents , the Lender may make an interim loan and advances to the Debtors in amount of $300,000 and the Debtors may use Cash Collateral in accordance with the Budget and the DIP Credit Agreement or existing loan documents. Notwithstanding anything in this Interim Order to the contrary, the Debtor shall use Cash Collateral and incur DIP Indebtedness and use the proceeds of the DIP Indebtedness solely in accordance with the covenants, formulae, Budget and other terms and conditions set forth in the DIP Credit

Documents or existing loan documents and this Interim Order. During the term of this Interim Order, the Debtor shall provide the DIP Lender with monthly cash flow reports by the close of business on the fifth business day following the end of the previous month. The Lender shall not have any obligation with respect to the proceeds of the DIP Facility, the Post-Petition Collateral, or the use of Cash Collateral, nor shall any of them be obligated to ensure or monitor the Debtor's compliance with any such covenants, formulae, Budget or other terms and conditions or be obligated to pay (directly or indirectly from the Post-petition Collateral) any expenses incurred or authorized to be incurred pursuant to the DIP Credit Documents or existing loan agreements. The Lender's consent to any Budget shall not be construed as a commitment to continue to provide the DIP Facility or permit the use of Cash Collateral after the occurrence of an Event of Default (as defined in the DIP Credit Documents or existing loan agreements) or beyond the Termination Date (as defined below), regardless of whether the aggregate funds described in the Budget have been expended. For purposes of this Interim Order, however, without the Lender's written consent, the Debtor shall not be deemed to be in default for any deviation from the Budget provided such deviation is not more than fifteen percent (15%) of the budgeted disbursements, either on a cumulative basis or with regard to any specific budgeted line item; provided, further, if (i) the Debtor is not otherwise in default, (ii) the Debtor has not deviated from the Budget, either on a cumulative basis or with regard to any specific budgeted line item, in any given month, and (iii) the Debtor's actual expenditures for any specific budgeted line item are less than the budgeted disbursements for such specific line item, then the budgeted disbursement for such line item for the following month shall be deemed automatically increased in an amount equal to the amount by which the budgeted disbursement exceeded the actual expenditure.

8. Super-priority Claim and Lien Priority.

(a) To secure the interim advance by Lender under the DIP Credit Agreement authorized hereunder or existing loan agreements, and to secure DIP Lender's Cash Collateral, the DIP Lender is hereby granted, and all of the DIP Obligations authorized by this Interim Order shall

and hereby do constitute, an allowed super-priority administrative expense claim against each Debtor (the "Super-priority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expense claims of any kind asserted against the Debtors, including, but not limited to, the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non consensual lien, levy or attachment, subject and subordinate in priority of payment only to the Permitted Priority Liens and.

(b)     As security for the DIP Obligations, in accordance with the terms of the DIP Credit Documents or existing loan documents and this Interim Order, effective immediately, the DIP Lender is hereby granted, pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code, subject and subordinate in priority of payment only to the Permitted Priority Liens, first priority, perfected security interests and liens in and on all Post-Petition Collateral (all of the foregoing collectively, the "Post-Petition Liens").

(c)     No lien or security interest granted to the Lender under this Interim Order or the DIP Credit Documents, as approved by this Interim Order, shall (i) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) hereafter be subordinated to or made *part passu* with any other lien or security interest created and/or perfected pursuant to section 364(c) of the Bankruptcy Code or otherwise. The Post-Petition Liens arising hereunder shall be and hereby are fully perfected security interests, such that no additional steps need be taken or the DIP Lender to perfect such interests. Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest or the proceeds thereof or other Post Petition Collateral related thereto shall have no force and effect with respect to the transactions granting the Lender a priority security interest in such leasehold interest, license, contract or agreement, or the proceeds of any assignment

and/or sale thereof by the Debtor in favor of the DIP Lender in accordance with the terms of the DIP Credit Agreement or existing loan documents.

(d)     The Post-Petition Liens and Super-priority Claim granted to the DIP Lender under this Interim Order shall continue in the Chapter 11 Case and in any superseding case for the Debtor under any chapter of the Bankruptcy Code, and such liens and security interests shall maintain their priority as provided in this Interim Order, until all the DIP Obligations have been paid in full and the Total Commitment is terminated.

9.     Fees.  All fees payable and costs and/or expenses reimbursable under the DIP Credit Documents by the Debtors to the Lender are hereby approved and shall be promptly paid by the Debtors in accordance with this Interim Order and the DIP Credit Documents or existing credit agreement, and the Debtor is hereby authorized to pay all such fees without the necessity of the Debtor, or the DIP Lender filing any further application with the Court for approval or payment of such fees or expenses. All fees and costs and/or expenses payable by the Debtor in connection with the recording, filing and insuring of financing statements, mortgages and financing statements to confirm (pursuant to Paragraph 15 of this Interim Order) the perfection of the security interests granted or authorized by this Interim Order are hereby approved and shall be promptly paid in full by the Debtors without the necessity of the Debtor, or the DIP Lender filing any further application with the Court for approval or payment of such fees, costs and/or expenses.

10.     No Stamp Tax.   Pursuant to 11 U.S.C. § 1146(c), the pledging of any collateral, the delivery of any security interests or other instruments of transfer, or the furnishing of any promissory note(s) or other evidence of indebtedness, in furtherance of or in connection with, the DIP Facility or the DIP Credit Documents, including (a) any mortgages, security agreements, collateral assignments, or other similar documents or agreements, or (b) evidence or documents of perfection (including transfers of assets to and by the lender in connection with enforcement of the DIP Credit Documents) shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use, or other similar tax.

11.    Authority to Execute and Deliver Necessary Documents. The Debtor is hereby authorized and empowered to enter into and deliver a DIP Credit Agreement and the other DIP Credit Documents including, but not limited to, UCC financing statements and mortgages or deeds of trust as necessary or appropriate and securing all of the Debtor's obligations under the DIP Credit Agreement and existing loan agreements, including repayment of all DIP Obligations in a maximum principal amount equal up to Maximum Final Borrowing. The Debtor is hereby further authorized, empowered, and directed (a) to perform all of its obligations under the DIP Credit Documents existing loan agreements and such other agreements as may be required by the DIP Credit Documents existing loan agreements to give effect to the terms of the financing provided for in the DIP Credit Documents as approved by this Interim Order, (b) to perform all acts required under the DIP Credit Documents and this Interim Order including, without limitation, the payment of all principal, interest, charges, fees, and the reimbursement of present and future reasonable costs and expenses (including without limitation, reasonable attorneys' fees and legal expenses) paid or incurred by the Lender or the Agent as provided for in this Interim Order, the DIP Credit Agreement and existing loan agreements, and the other DIP Credit Documents, all of which unpaid principal, interest, charges, fees, reasonable attorneys' fees and the reimbursement of present and future reasonable costs and expenses shall be included and constitute part of the principal amount of the DIP Obligations, be deemed a Super-priority Claim having the same priority as all other DIP Obligations hereunder and be secured valid and perfected liens on and security interests in all of the Post-Petition Collateral as and to the extent provided for in this Interim Order, the DIP Credit Agreement and existing loan agreements, and the other DIP Credit Documents, subject and subordinate in priority of payment only to the Permitted Priority Liens, and (c) to do and perform all other acts, to make, execute, and deliver all other instruments, agreements, and documents, which may be required or necessary for the Debtor to perform all of their obligations under this Interim Order and the DIP Credit Documents and existing loan agreement, without further order of the Court and pending the Final Hearing. The DIP Obligations shall constitute valid and binding obligation

of the Debtor enforceable against it, and its successors and assigns, in accordance with the terms of the DIP Credit Documents and existing loan agreement and this Interim Order.

12.     <u>Amendments.</u>     The Debtor and Lender may enter into any amendments or modifications to the DIP Credit Documents without the need of further notice and hearing or order of this Court, provided that (a) such modifications or amendments do not materially and adversely *affect,* in the reasonable view of the Debtor, the rights of any creditor or other party in-interest and (b) notice of any such amendment or modification is filed with the Court.

13.     <u>Limitation On Surcharges.</u>     No action, inaction, or acquiescence by the DIP Lender, including the DIP Lender's funding of the Debtor's ongoing operations shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Lender to a charge against the Post-Petition Collateral or Lender pursuant to sections 506(c), 552(b) or 105(a) of the Bankruptcy Code. The DIP Lender shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Post-Petition Collateral.

14.     <u>Additional Perfection Measures.</u>

(a) The liens, security interests, and priorities granted to the DIP Lender pursuant to this Interim Order and the DIP Credit Documents with respect to property of the Debtor's estate shall be perfected by operation of law immediately upon entry of this Interim Order by the Court;

(b) Neither the Debtors nor the Lender shall be required to enter into or to obtain landlord waivers, mortgagee waivers, bailee waivers, or warehouseman waivers or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, trade name, or patent assignment filings with the United States Patent and Trademark Office, Copyright Office, or any similar agency with respect to intellectual property), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the security interest and Post-Petition Liens granted pursuant to this Interim Order;

(c) If the Lender, in its sole discretion, chooses to obtain consents from any licensor

or similarly situated party-in-interest, to file financing statements, notices of lien or similar instruments, to record financing statements, mortgages or deeds of trust, or to otherwise confirm perfection of such security interests and liens: (i) the Lender is authorized and empowered to file or record financing statements, mortgages, deeds of trust or similar instruments which secure the DIP Obligations up to the maximum principal amount of the maximum final borrowing; (ii) all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and (iii) no defect in any such act shall affect or impair the validity, perfection, and enforceability of the liens granted hereunder;

(d) In lieu of obtaining such consents or filing such financing statements, notices of lien or similar instruments, the Lender may, at its sole discretion, choose to file a true and complete copy of this Interim Order or memorandum of same in any place at which any such instruments would or could be filed, together with a description of Post-Petition Collateral located within the geographic area covered by such place of filing, and such filing by the Lender shall have the same effect as if such financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order,

(e) The Lender may deliver a copy of this Interim Order to any third parties having possession or control of Pre-Petition Collateral, Cash Collateral, or Post-Petition Collateral.

15. _Access to Information._ Without limiting the rights of access and information afforded the DIP Lender under the DIP Credit Agreement and existing loan agreement and other DIP Credit Documents, the Debtor shall permit representatives, agents and/or employees of the DIP Lender to have reasonable access to its premises and its records during normal business hours (without unreasonable interference with the proper operation of the Debtor's businesses) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

16. _Access to Collateral._ Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Lender contained in this

Interim Order or the DIP Credit Documents or existing loan agreements, or otherwise available at law or in equity, and subject to the terms of the DIP Credit Agreement, upon three (3) business days' written notice to the landlord of any leased premises upon which any Post-Petition Collateral is located (a "Landlord"), that an Event of Default by the Debtor of any of its obligations under the DIP Credit Documents or existing loan agreement or this Interim Order has occurred and is continuing, the DIP Lender may, subject to any separate agreement by and between such Landlord and the DIP Lender, enter upon any leased premises of the Debtor for the purpose of exercising any remedy with respect to Post-Petition Collateral located thereon and shall be entitled to all of the Debtor's rights and privileges as lessee under such lease without interference from the Landlord thereunder, provided, however, that the Lender shall only pay base rent as defined in the lease with any such Landlord (or other agreement between Lender and the Landlord) and additional rent obligations of the Debtors (limited to charges for utilities, unless otherwise agreed between the Landlord and Lender) that first arise after the Lender's written notice referenced above and that are payable during the period of such occupancy by the Lender, calculated on a per diem basis. Nothing herein shall require the Debtors to assume and assign to the Lender any lease under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the Lender in this paragraph.

17.     <u>Cash Management Systems.</u>     The Debtor is authorized and directed to maintain its cash management system in a manner consistent with the DIP Credit Documents or existing loan agreement . The Lender is hereby granted, pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code, first priority, perfected security interest and lien in and on the Debtor's bank accounts, subject and subordinate in priority of payment only to the Permitted Priority Liens.

18.     <u>Automatic Stay Modified.</u>     The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified to the extent necessary so as to permit the Lender:

(a)     upon the occurrence and during the continuance of an Event of Default under the DIP Credit Documents, and after ten days' notice and opportunity to cure, Lender shall have the

right to exercise its non-bankruptcy law rights, including right of foreclosure without any further recourse to the Bankruptcy Court.

(b)     Solely for purposes of the preceding clause, the automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall only be deemed terminated as provided herein without the necessity of any further action by the Court in the event that the Debtor or any party in interest has not filed an objection with the Court within five (5) business days after receiving such notice (which notice must be filed with Court by the Lender) from the Lender pursuant to this Interim Order. The Debtor or any party in interest shall have the burden of proof at any hearing on any request by them to re-impose or continue the automatic stay of section 362(a) of the Bankruptcy Code or too obtain any other injunctive relief; and the only issue that may be raised at any such hearing shall be whether, in fact, an Event of Default or Default has occurred and is continuing;

(c)     this Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter *any* orders required by the provisions of this Interim Order and relating to the application, re-imposition, or continuance of the automatic stay of section 362(a) of the Bankruptcy Code or other injunctive relief requested; and

(d) upon the occurrence and during the continuance of an Event of Default by the Debtors of any of their obligations under the DIP Credit Documents, the Lender, may, without providing any prior notice thereof, immediately charge interest at the Post-Default Rate set forth in the DIP Credit Agreement.

19.     Termination of Authorization to Use Cash Collateral. Upon the occurrence and during the continuance of an Event of Default under the DIP Credit Documents or of this Interim Order, the DIP Lender shall have no further obligation to provide financing under the DIP Credit Documents or exiting lean agreement as approved by this Interim Order, and the authorization to use Cash Collateral under the terms of this Interim Order shall automatically terminate, excluding monies included in the Budget during the Default Periods and the carve-out

expenses; provided, however, that if the Debtor's right to use Cash Collateral has been terminated pursuant to the provisions of this Interim Order, such right may be extended only upon (i) consent of the Lender, (ii) the DIP Obligations having been otherwise paid in full, or (iii) further Order of this Court entered upon and after appropriate notice and opportunity for a hearing being provided to the DIP Lender. The DIP Lender shall have no obligation to agree to such an extension under any circumstances and may elect or not elect to agree to such an extension as it determines in its sole and absolute discretion.

20. No Responsible Person/Fiduciary. In making the decision to make DIP Advances, administering the DIP Advances, and extending other financial accommodations to the Debtor under the DIP Credit Agreement or existing loan agreement or to collect the indebtedness and obligations of the Debtor, the DIP Lender (a) shall not owe any fiduciary duty to the Debtor, its creditors, partners or estate; and (b) shall not be considered to be exercising control over any operations of the Debtor or acting in any way as a responsible person, an owner or an operator under any applicable Law, including without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 *U.S.C. § 9601, et seq.,* the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, *et seq.,* as either may be amended from time to time, or any similar federal or state statute). Nothing in this Interim Order or any other documents related to this transaction shall be in any way construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the pre-petition or post-petition activities of the Debtor in the operation of their businesses or in connection with their restructuring efforts.

21. Successors and Assigns. The DIP Credit Documents and the provisions of this Interim Order shall be binding upon the DIP Lender, the Debtor and its respective successors and assigns, and shall inure to the benefit of the DIP Lender and the Debtor and its respective successors and assigns including, without limitation, any trustee, responsible officer, examiner with expanded powers, estate administrator or representative, or similar person appointed in a case for

the Debtors under any chapter of the Bankruptcy Code.

22.    No Third Party Beneficiary.    Except with respect to the DIP Lender, its delegates, successors and assigns, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

23.    Binding Nature of Agreement.    Each of the DIP Credit Documents to which the Debtor are and will become a party shall constitute legal, valid, and binding obligations of the Debtor enforceable against the Debtor in accordance with their terms. The DIP Credit Documents have been or will be properly executed and delivered to the DIP Lender by the Debtor. The rights, remedies, powers, privileges, liens, and priorities of the DIP Lender provided for in this Interim Order and in any other DIP Credit Documents shall not be modified, altered, or impaired in any manner by any subsequent order (including a confirmation order) or by any plan of reorganization or Liquidation in these cases or in any subsequent case under the Bankruptcy Code, unless and until the DIP Obligations have first been paid in full in cash and completely satisfied and the Total Commitment is terminated in accordance with the DIP Credit Agreement.

24.    Subsequent Reversal or Modification.    This Interim Order is entered pursuant to section 364 of the Bankruptcy Code, granting the DIP Lender all protections afforded by section 364(e) of the Bankruptcy Code. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, that action will not affect (a) the validity of any obligation, indebtedness, or liability incurred hereunder by the Debtor to the DIP Lender prior to the date of receipt by the DIP Lender of written notice of the effective date of such action, or (b) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Documents. Notwithstanding any such reversal, stay, modification, or vacatur, any post-petition indebtedness, obligation, or liability incurred by the Debtor to the DIP Lender prior to written notice to the DIP Lender of the effective date of such action shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Credit Documents with respect to all such

indebtedness, obligation, or liability.

25. <u>No Waivers.</u>

(a)    This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender may have to bring or be heard on any matter brought before this Court.

(b)    The rights and obligations of the Debtor and the rights, claims, liens, security interests, and priorities of the DIP Lender arising under this Interim Order are in addition to, and are not intended as a waiver or substitution for, the rights, obligations, claims, Liens, security interests, and priorities granted by the Debtors under the DIP Credit Documents.

(c) Without limiting the generality of the foregoing subparagraphs, the Lender may petition this Court for any such additional protection they may reasonably require with respect to the DIP Indebtedness or otherwise.

26. <u>Sale/Conversion/Dismissal.</u>

(a)    If an order is entered (i) dismissing the Chapter 11 Case under sections 305 or 1112 of the Bankruptcy Code or otherwise, (ii) converting the Chapter 11 Cases under section 1112 of the Bankruptcy Code, or (iii) appointing a chapter 11 trustee or an examiner with expanded powers, such order shall provide that the liens, security interests, and Super-priority Claims granted to the Lender hereunder and in the DIP Credit Documents, as the case may be, shall continue in full force and effect, shall remain binding on all parties-in-interest and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been indefeasibly paid in full in cash and the Total Commitment shall have been terminated in accordance with the DIP Credit Agreement, and this Court shall retain jurisdiction to the fullest extent permitted by law, notwithstanding such dismissal, for purposes of enforcing the liens, security interests and Super-priority Claims of the Lender, as the case may be.

27. <u>Survival.</u>    The post-petition Liens, lien priority, administrative priorities and other rights and remedies with respect to the Debtor granted to the DIP Lender pursuant to the

DIP Credit Documents and existing loan agreement and the Interim Order (specifically including, but not limited to, the existence, perfection, and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered, or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), by any dismissal or conversion of the Chapter 11 Case, or by the confirmation of a plan of reorganization in the Chapter 11 Case which does not (i) contain a provision for termination of the Total Commitment and payment in full in cash of all Obligations of the Borrowers and the other Loan Parties hereunder and under the DIP Credit Documents on or before the effective date of such plan and (ii) provide for the continuation of the Liens and security interests of the DIP Lender and the priorities thereof until the earlier of (A) such plan effective date, and (B) the date the Obligations are paid in full in cash and the Total Commitment is terminated, or by any other act or omission whatsoever.

28.     Priority of Terms.     To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Credit Documents, on the one hand, and (b) the Motion and the terms and provisions of this Interim Order, on the other hand, the terms and provisions of the DIP Credit Documents shall govern.

29.     Adequate Notice.     The notice given by the Debtor of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the local rules of this Court. Under the circumstances, no other or further notice of the request for the relief granted at the Interim Hearing is required. The Debtor shall promptly mail copies of this Interim Order and notice of the Final Hearing to the Notice Parties. Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be actually received no later than five days prior to the Final Hearing by the following: (a) counsel to the Debtors, Wiley F. James, III, James & Haugland, P.C., 609 Montana Ave., El paso, Texas, 79902, and (b) counsel to the Lender,

Michael Hicks, Mullin, Hoard & Brown, LLP, 1500 Broadway, Suite 700, Lubbock, Texas, 79401.

30. <u>Entry of Order, Effect</u>. This Order shall take effect immediately upon execution hereof, notwithstanding the possible application of Fed. R. Bankr. P. 6004(g), 7062, 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Interim Order on the Court's docket in these Chapter 11 Cases.

The Debtors may seek approval to pay such obligations by separate motion to the Court.

31. <u>Notice of Default Notice.</u>   Upon receipt of a Notice of Default from the Lender, the Debtor shall file such notice with the clerk, and serve such notice on the parties listed on the Master Service List in these cases.

32. <u>Final Hearing</u>. The Court shall conduct a Final Hearing on the Motion shall be heard on the above specified date and time in the U.S. Bankruptcy Courtroom located at 8515 Lockheed, El Paso, Texas, 79925..

# # #

Submitted by:
Wiley F. James, III
James & Haugland, P.C.
P.O. Box 1770, El Paso, TX 79949-1770
(915) 532-3911 Phone
(915) 541-6440 Fax

Upon entry of this Order, please return a copy to the attorney listed above.