# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated as of June 9, 2011 (this "Agreement"), is made by and between **TRANSPECOS FOODS, LP**, a Texas limited partnership ("Seller"), and **MONOGRAM LICENSING, LLC**, a Tennessee limited liability company ("Buyer").

## RECITALS:

**WHEREAS**, Seller intends to file a voluntary petition (the "Voluntary Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas (the "Bankruptcy Court");

**WHEREAS**, it is contemplated that Seller will operate its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, Seller desires to sell, and Buyer desires to purchase, certain of the assets of Seller, and Buyer agrees to assume certain liabilities of Seller for the consideration and on the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS**, Seller agrees to file a motion seeking approval of the sale ("Sale Motion") under Section 363 of the Bankruptcy Code and the assumption of certain executory contracts and liabilities under Section 365 of the Bankruptcy Code; and

**WHEREAS**, upon the filing of the Sale Motion, the Assets will be sold pursuant to the terms of this Agreement and an order entered by the Bankruptcy Court (the "Sale Order") approving the Sale Motion and the sale under Section 363 of the Bankruptcy Code and the assumption of certain executory contracts and liabilities under Section 365 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1 <u>Definitions</u>. Certain capitalized but undefined terms used in this Agreement shall have the meanings specified in this Article I:

"Accounts Receivable" shall mean any and all accounts receivable, notes receivable and other amounts receivable and owed to Seller arising out of, or related to, the sale of goods and/or the provision of services, together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, as of the Closing.

"Adjustment Amount" shall have the meaning set forth in Section 3.3.

**EXHIBIT**

tabbies®

M-1

"Affiliate" shall mean, with respect to any specified Person, any other Person that directly, or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"Agreement" shall have the meaning set forth in the preface above.

"Allocation" shall have the meaning set forth in Section 6.7(e).

"Assets" shall mean, collectively, all of the right, title and interest that Seller possesses as of the Closing in and to the following assets and property, wherever located: (i) to the extent assignable under Section 365 of the Bankruptcy Code or to the extent assignment is consented to by the third party or third parties to such agreements, all Assumed Contracts; (ii) all machinery, equipment, tools and fixtures listed on Schedule 1.1(a), together with all supplies, materials, spare parts, any express or implied warranty by the manufacturers or sellers of any such item or component part thereof, all maintenance, service and warranty Records, operating guides and manuals and other documents relating thereto (collectively, the "Equipment"); (iii) all inventories of Seller related to the Business, wherever located, including, but not limited to, inventory reserves, raw materials, work in process, finished goods, supplies and materials as of the Closing Date (collectively, the "Inventory"); provided, however, that in no event shall Inventory include obsolete or slow-moving inventory, or any other items of inventory not acceptable to Buyer in its sole discretion; (iv) all client and customer lists and Records, production reports and Records, financial and accounting Records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and Records, in each case to the extent relating to the Business, but excluding Seller's Records relating solely to the corporate governance of Seller; and (v) all of the intangible rights and property of Seller related to the Business including all information used in or arising from the Business, Intellectual Property Assets, going concern value, goodwill, all UPC codes, know-how, customer lists, stock-keeping units of customers, processes of production, ideas, confidential business information, techniques, recipes and product specifications (for currently offered and planned products), processes and formulas, (collectively, the "Intangible Property"); provided, however, that in no event shall the Assets be deemed to include the Excluded Assets.

"Assumed Contracts " shall mean all Contracts related to the Business that are listed on Schedule 1.1(b) attached hereto, as amended from time to time as contemplated in Section 3.4(a) below.

"Assumed Liabilities" shall mean the obligations of Seller under the Assumed Contracts, the obligation to pay the Cure Amounts and the Cure Expenses and any other liabilities listed in Schedule 1.1(b).

"Assumption Agreement" shall have the meaning set forth in Section 4.2(e).

"Bankruptcy Code" shall have the meaning set forth in the Recitals of this Agreement.

"Bankruptcy Court" shall have the meaning set forth in the Recitals of this Agreement.

"Bill of Sale" shall have the meaning set forth in Section 4.2(a).

M KCD 2233375 v21
2910330-000001

"Business" shall mean the business and operations of Seller relating to the production of frozen food appetizers.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which banks are required or authorized by law to be closed in Memphis, Tennessee.

"Buyer" shall have the meaning set forth in the preface of this Agreement

"Buyer Disclosure Schedule" shall have the meaning set forth in Section 5.2 of this Agreement.

"Buyer's Representatives" shall mean Buyer's accountants, employees, counsel, financial advisors, consultants and other authorized representatives.

"Chapter 11 Case" shall mean Seller's case commenced under Chapter 11 of the Bankruptcy Code.

"Claim" shall have the meaning set forth in Section 5.1(d) below.

"Claimant" shall have the meaning set forth in Section 6.9.

"Closing" shall have the meaning set forth in Section 4.1 below.

"Closing Conditions" shall have the meaning set forth in Section 4.1 below.

"Closing Date" shall mean the date on which Closing occurs.

"Closing Inventory Value" shall mean an amount equal to the Closing Date book value of the Inventory valued at Seller's standard cost.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Contract" shall mean any agreement, consensual obligation, promise or undertaking (whether written or oral and whether express or implied).

"Copyrights" shall have the meaning set forth in the definition of Intellectual Property Assets.

"Cure Amounts" shall have the meaning set forth in Section 3.4(b).

"Cure Expenses" shall have the meaning set forth in Section 3.4(c).

"Cure Payments" shall have the meaning set forth in Section 3.4(b).

"Deposit Account" shall mean a demand, time, deposit, bank, savings, passbook or similar account maintained by a bank or other Person on behalf of Seller.

"Diligence Materials" shall mean all third-party reports, memoranda and other diligence materials with respect to the Assets prepared by or at the request of Buyer; provided, however,

3

that in no event shall the Diligence Materials include any materials that are subject to the attorney-client privilege, work-product doctrine or any materials that are otherwise proprietary and confidential to Buyer or its Affiliates.

"Encumbrances" shall mean any mortgages, hypothecations, pledges, liens, claims (including options and rights of first refusal), charges, rights of third parties (express or implied), security interests, conditional and installment sale agreements, activity and use limitations, conservation easements, servitudes, deed restrictions, equitable interests, exceptions to title, encumbrances, causes of action, rights, demands and claims (for any and all types of relief) in litigation, charges of any kind and encumbrances affecting property of any nature, whether accrued or unaccrued, tangible or intangible, or absolute or contingent.

"Equipment" shall have the meaning set forth within the definition of Assets.

"Excluded Assets" shall mean (i) Deposit Accounts (including, without limitation, all cash, restricted cash and cash equivalents contained therein), investments, marketable securities and petty cash; (ii) Accounts Receivable; (iii) Prepaid Expenses and Retainers; (iv) any Contract that terminates or expires prior to the Closing in accordance with its terms or in the ordinary course of the Business; (v) any and all legal or equitable causes of action of Seller accrued prior to Closing, including, but not limited to, any and all preference or avoidance claims and actions of Seller arising under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code; (vi) Seller's rights under this Agreement, and all cash and non-cash consideration payable or deliverable to Seller pursuant to the terms and provisions hereof; (vii) insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any Contract which is not assigned to Buyer at the Closing, or (B) any item of tangible or intangible property not acquired by Buyer at the Closing; (viii) real property owned or leased by Seller; (x) Tax refunds with respect to Seller; and (xi) Seller's insurance policies. Notwithstanding the foregoing, in no event shall the term "Excluded Assets" include any Cure Amounts which are paid by Buyer.

"Final Order" shall mean an order of the Bankruptcy Court: (i) as to which the time to appeal shall have expired and as to which no appeal shall then be pending, or (ii) if an appeal shall have been filed or sought, either (A) no stay of the order shall be in effect or (B) if such a stay shall have been granted by the Bankruptcy Court, then (1) the stay shall have been dissolved or (2) a final order of the district court, or the Bankruptcy Appellate Panel, having jurisdiction to hear such appeal shall have affirmed the order and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court order or timely motion to seek review or rehearing of such order shall have been made, any court of appeals having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or Bankruptcy Appellate Panel's) order upholding the order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible.

"GAAP" means United States generally accepted accounting principles, consistently applied.

4

"Good Faith Deposit" shall have the meaning set forth in Section 3.2.

"Governmental Authority" shall mean any federal, municipal, state, local or foreign governmental, administrative or regulatory authority, department, agency, commission or body.

"Infringe" shall have the meaning set forth in Section 5.1(d).

"Intangible Property" shall have the meaning set forth in the definition of Assets.

"Intellectual Property Assets" shall mean all intellectual property owned or licensed (as licensor or licensee) by Seller in which Seller has a proprietary interest, including: (i) Seller's name, all assumed fictional business names, trade names, registered and unregistered trademarks, service marks and applications (collectively, "Marks"); (ii) all patents, patent applications and inventions and discoveries that may be patentable (collectively, "Patents"); (iii) all registered and unregistered copyrights in both published works and unpublished works (collectively, "Copyrights"); (iv) all rights in mask works; (v) all know-how, trade secrets, confidential or proprietary information, customer lists, software, technical information, data, process technology, plans, drawings and blue prints (collectively, "Trade Secrets"); and (vi) all rights in internet web sites and internet domain names presently used by Seller (collectively "Net Names").

"Inventory" shall have the meaning set forth in the definition of Assets.

"Marks" shall have the meaning set forth in the definition of Intellectual Property Assets.

"Net Names" shall have the meaning set forth in the definition of Intellectual Property Assets.

"Patents" shall have the meaning set forth in the definition of Intellectual Property Assets.

"Person" shall mean any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or government, political subdivision, agency or instrumentality of a government.

"Prepaid Expenses and Retainers" shall mean any sums paid by Seller to a Person in respect of services or products to be provided to Seller by such Person in the future (including prepaid insurance premiums) or in contemplation of the Chapter 11 Case.

"Purchase Price" shall have the meaning set forth in Section 3.1(a)(i).

"Recall Costs" shall mean all losses, damages, costs and expenses incurred by Buyer in connection with the seizure, destruction, recall or withdrawal of Seller's products which occurred in May 2011, which shall not exceed the Recall Escrow Amount.

"Recall Escrow Amount" shall mean Seventy-Five Thousand Dollars ($75,000.00).

M KCD 2233375 v21
2910330-000001

"Record" shall mean information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Regulatory Approvals" shall have the meaning set forth in Section 6.6(a).

"Reimbursement Fee" shall mean the reasonable out-of-pocket expenses incurred by Buyer in connection with preparing this Agreement and performing due diligence with respect to the Assets, up to an aggregate amount of Fifty Thousand Dollars ($50,000.00).

"Retained Liabilities" shall mean all liabilities of the Seller other than the Assumed Liabilities. In furtherance and not in limitation of the foregoing, the Retained Liabilities include all: (i) Taxes of Seller attributable to the Assets and the Business with respect to any period or portion thereof that ends on or prior to the Closing or arising as a result of the transactions contemplated by this Agreement, including the Transaction Taxes which are governed by Section 6.7(a) below; provided, however, that any Taxes incurred or accrued in connection with Seller's operations under the Supply Agreement shall be paid by Buyer pursuant to the terms of the Supply Agreement; and (ii) any obligations or liabilities arising prior to the Closing under the Worker Adjustment and Retraining Notification Act of 1988, as amended, with respect to any of Seller's present or former employees.

"Sale Hearing" shall mean the hearing at which the Bankruptcy Court considers approval of the Sale Order.

"Sale Motion" shall have the meaning set forth in the Recitals of this Agreement.

"Sale Order" shall have the meaning set forth in the Recitals of this Agreement.

"Seller" shall have the meaning set forth in the preface of this Agreement.

"Seller Disclosure Schedule" shall have the meaning set forth in Section 5.1.

"Substantial Customers" means the following customers of Seller: (1) Ahold; (2) Dairy Queen; (3) Whataburger; (4) HEB; (5) Labatt; and (6) Walmart.

"Superior Offer" shall mean an offer to purchase the Assets that (i) is on substantially the same terms as the terms set forth in this Agreement, other than terms with respect to price and Assumed Liabilities, which terms shall be more favorable to Seller than the terms contemplated by this Agreement and (ii) is based on a form of asset purchase agreement (or other purchase and sale agreement) that is in substantially the form of this Agreement.

"Supply Agreement" shall have the meaning set forth in Section 4.2(f).

"Tax" and "Taxes" shall mean all taxes, charges, fees, levies, penalties or other assessments of any kind whatsoever imposed by any federal, provincial, municipal, state, local or foreign taxing authority, including any interest, penalties or additions attributable thereto, whether disputed or not, including such item for which a liability arises as a transferee or successor in interest.

M KCD 2233375 v21
2910330-000001

"Tax Return" shall mean any return, report, information return or other document (including any related or supporting information) required to be supplied to any Governmental Authority with respect to Taxes that are related to the Business.

"Trademark Assignment" shall have the meaning set forth in Section 4.2(g).

"Trade Secrets" shall have the meaning set forth in the definition of Intellectual Property Assets.

"Transaction Taxes" shall have the meaning set forth in Section 6.7(a).

"Voluntary Petition" shall have the meaning set forth in the Recitals of this Agreement.

Section 1.2    Construction.  The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. The term "including," when used herein without the qualifier, "without limitation," shall mean "including, without limitation." Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require. The word "or" shall not be construed to be exclusive. Provisions shall apply, when appropriate, to successive events and transactions. Unless otherwise indicated, references to Articles and Sections refer to Articles and Sections of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets: Assumption of Assumed Liabilities.  Subject to the terms and conditions set forth in this Agreement, at the Closing:

(a)    Seller shall sell, assign, convey, transfer and deliver to Buyer, and Buyer shall purchase and acquire from Seller, free and clear of all Encumbrances, the Assets; and

(b)    Seller shall assign to Buyer and Buyer shall assume the Assumed Liabilities.

Section 2.2    Retained Liabilities.    Notwithstanding any provision herein to the contrary, Buyer shall not assume or be obligated to pay, perform or otherwise discharge any Retained Liability.

## ARTICLE 3
## PURCHASE PRICE; GOOD FAITH DEPOSIT; CURE AMOUNTS

Section 3.1    Purchase Price.

(a)    In consideration for the Assets, and subject to the terms and conditions of this Agreement, and the entry and effectiveness of the Sale Order, at the Closing, Buyer shall: (i) deliver to Seller One Million Five Hundred Thousand Dollars ($1,500,000.00), plus or minus any Adjustment Amount minus the Recall Escrow Amount (the "Purchase Price"), by delivering

M KCD 2233375 v21
2910330-000001

to Seller a wire transfer in immediately available funds in an amount equal to the Purchase Price less the amount of the Good Faith Deposit that Buyer previously paid to Seller pursuant to Section 3.2; and (ii) assume the Assumed Liabilities.

(b) Within sixty (60) days after Closing, Buyer shall pay to Seller an amount equal to the Recall Escrow Amount less the Recall Costs.

Section 3.2 <u>Good Faith Deposit</u>. Within three (3) days after the filing of the Sale Motion, Buyer shall deliver to Seller a certified check payable to the order of Seller or a wire transfer to an account designated by Seller in the amount of Fifty Thousand Dollars ($50,000.00) (the "<u>Good Faith Deposit</u>"). The Good Faith Deposit shall be applied toward the Purchase Price at Closing. Unless otherwise agreed by Buyer and Seller and approved by the Bankruptcy Court, the Good Faith Deposit shall be returned to Buyer if the Closing does not occur other than because of Buyer's breach of this Agreement.

Section 3.3 <u>Calculation of Adjustment Amount</u>. After the close of business on the day prior to the Closing Date, representatives of Seller and Buyer shall physically count all Inventory, which Inventory level shall be used to establish the Closing Inventory Value. The parties shall cooperate in good faith with respect to the Inventory count and valuation. To be included in the Closing Inventory Value, a particular item of Inventory must be of a quality usable and saleable in the ordinary course of business and not be obsolete, short-dated or below standard quality in the reasonable determination of Buyer. Before the Closing, Seller shall deliver to Buyer a statement of the Closing Inventory Value, as determined in accordance with this <u>Section 3.3</u>. The "<u>Adjustment Amount</u>" shall equal One Million Dollars ($1,000,000) minus the Closing Inventory Value. If the Adjustment Amount is a positive number, the Adjustment amount shall be subtracted from the Purchase Price; if the Adjustment Amount is a negative number, the absolute value of the Adjustment Amount shall be added to the Purchase Price.

Section 3.4 <u>Cure Provisions With Respect to Assumed Contracts</u>.

(a) <u>Schedule 1.1(b)</u> sets forth a list of the Assumed Contracts. Consistent with the Sale Motion seeking approval of the sale of the Assets to Buyer, from time to time on or prior to the date that is five (5) Business Days after the filing of the Sale Motion, Seller shall make such additions or deletions to the list of Assumed Contracts as Buyer shall request, and the amount of the Cure Payments and <u>Schedule 1.1(b)</u> shall be modified accordingly.

(b) <u>Schedule 1.1(b)</u> sets forth (i) the estimated amounts necessary to cure defaults, if any, under each of the Assumed Contracts and (ii) deposits, advances, credits and security deposits made by Seller under each of the Assumed Contracts. If there exists on the Closing any monetary default under any of the Assumed Contracts, Buyer shall be responsible for the payment of any and all amounts necessary to cure such default pursuant to Section 365(b)(1) of the Bankruptcy Code as a condition to the assumption and assignment thereof (the "<u>Cure Payments</u>"). Buyer shall reimburse Seller in cash and in full for any and all deposits, advances and credits and security deposits set forth on <u>Schedule 1.1(b)</u> (together with the Cure Payments, the "<u>Cure Amounts</u>") and, as promptly as practicable but no later than five (5) Business Days following Closing, replace any letters of credit set forth on <u>Schedule 1.1(b)</u>, in all such cases related to any Assumed Contracts. Pursuant to the Sale Motion, Seller shall serve

notice of the Cure Amounts identified on Schedule 1.1(b) upon the parties to the Assumed Contracts. Pursuant to the Sale Motion, any objections to the Cure Amounts by parties to the Assumed Contracts must be filed on or before three (3) Business Days prior to the Sale Hearing. Any objections to the Cure Amounts listed on Schedule 1.1(b) will be heard at the Sale Hearing. Buyer shall pay the amounts identified on Schedule 1.1(b) (or such different amount as ordered by the Bankruptcy Court) at or prior to the Closing. Notwithstanding the foregoing, if Buyer elects not to pay the Cure Amounts as to any Assumed Contract, such Assumed Contract shall be deleted from Schedule 1.1(b) and shall thereafter be excluded from the category of Assumed Contracts.

(c)     Buyer shall be solely responsible for any and all of its costs and expenses necessary in connection with providing adequate assurance of future performance with respect to any of the Assumed Contracts under Section 365(f) of the Bankruptcy Code (the "Cure Expenses").

(d)     Notwithstanding any provision herein to the contrary, in no event shall Buyer have any liability for, and Seller shall not be deemed to have assigned, any Contract until there is an order of the Bankruptcy Court with respect to such Contract.

## ARTICLE 4
## THE CLOSING

Section 4.1     Time and Place of the Closing.     Upon the terms and subject to the satisfaction of the conditions to closing set forth in Article VII below (the "Closing Conditions"), the closing of the transaction contemplated by this Agreement ("Closing") shall take place at the offices of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, 165 Madison Avenue, Suite 2000, Memphis, TN 38103, at 10:00 A.M. (local time) no later than the second (2nd) Business Day following the date on which the last of the Closing Conditions has been satisfied (other than the conditions with respect to actions the respective parties hereto will take at the Closing itself) or, to the extent permitted, waived in writing, or at such other place and time as Buyer and Seller may mutually agree.

Section 4.2     Deliveries by Seller.     At the Closing, Seller shall deliver the following to Buyer:

(a)     a Bill of Sale, duly executed by Seller, in substantially the form attached hereto as Exhibit 4.2(a) (the "Bill of Sale");

(b)     all consents, waivers and approvals obtained by Seller with respect to the sale, assignment, conveyance, transfer and delivery of the Assets and the consummation of the transactions required in connection with the sale of the Assets contemplated by this Agreement;

(c)     the certificate contemplated by Section 7.2(b);

(d)     certified copies of resolutions duly adopted by Seller's general partner and/or limited partners authorizing the execution, delivery and performance of this Agreement and each of the other transactions contemplated hereby;

9

(e)     an Assumption Agreement, duly executed by Seller, in substantially the form attached hereto as Exhibit 4.2(e) (the "Assumption Agreement");

(f)     a Supply Agreement, duly executed by Seller, in substantially the form attached hereto as Exhibit 4.2(f) (the "Supply Agreement");

(g)     an Assignment of Trademarks, duly executed by Seller, in substantially the form attached hereto as Exhibit 4.2(g) (the "Trademark Assignment");

(h)     a copy of the Sale Order; and

(i)     a statement of the Closing Inventory Value pursuant to Section 3.3.

Section 4.3     Deliveries by Buyer.  At the Closing, Buyer shall deliver the following to Seller:

(a)     the Purchase Price in accordance with Section 3.1 above;

(b)     the Assumption Agreement, duly executed by Buyer;

(c)     the Supply Agreement, duly executed by Buyer;

(d)     the Cure Amounts in accordance with Section 3.4; and

(e)     the certificate contemplated by Section 7.3(b).

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

Section 5.1     Representations and Warranties of Seller.  Except as set forth on the disclosure schedule dated as of this Agreement and executed and delivered by Seller to Buyer concurrently with or prior to the execution and delivery by Seller of this Agreement (the "Seller Disclosure Schedule"), Seller hereby represents and warrants to Buyer as of the date hereof and as of the Closing Date, or as of another date if so specified, as set forth below. Each exception set forth in the Seller Disclosure Schedule, and any other information included in the Seller Disclosure Schedule, is identified by reference to, or has been grouped under a heading referring to, a specific individual subsection of this Agreement and shall be deemed to be disclosed solely for purposes of such subsection, except to the extent that disclosure in one subsection of the Seller Disclosure Schedule is specifically referred to in another subsection of the Seller Disclosure Schedule by appropriate cross-reference.

(a)     Power and Authority.  Subject to the applicable provisions of the Bankruptcy Code and the approval of this Agreement by the Bankruptcy Court, Seller has all limited partnership power to execute and deliver this Agreement and, upon entry and effectiveness of the Sale Order, will have all limited partnership authority necessary to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the general partner of Seller and no other corporate or other entity

10

proceedings on the part of Seller are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Seller, and assuming that this Agreement constitutes a valid and binding agreement of Buyer, and, subject to the entry and effectiveness of the Sale Order and any applicable Bankruptcy Code provision, constitutes a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms.

(b)     Consents and Approvals; No Violation; Title to Assets. Except to the extent excused by or unenforceable as a result of the filing of the Chapter 11 Case and except for the entry and effectiveness of the Sale Order, neither the execution and delivery of this Agreement nor the sale by Seller of the Assets pursuant to this Agreement will conflict with or result in any breach of any provision of Seller's Certificate of Limited Partnership or Limited Partnership Agreement; or require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority by or on behalf of Seller which has not otherwise been obtained or made. As of the Closing Date Seller shall have good and valid title to the Assets. At the Closing, Buyer, pursuant to the Sale Order and delivery of the Bill of Sale (duly executed by Buyer), shall acquire all of the Assets, in each case free and clear of all Encumbrances.

(c)     Brokers. No Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by Seller or any of its Affiliates in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

(d)     Intangible Property. Seller owns or has the valid right to use all Intangible Property. The Intangible Property constitutes all of the intangible assets necessary to conduct the Business as currently conducted and as is consistent with past practice. As of the Closing Date, all Intangible Property shall be owned by Seller free and clear of all Encumbrances, and shall be currently subsisting, valid and enforceable. The consummation of the transactions contemplated hereby will not impair, limit, terminate or nullify any rights relating to the Intangible Property or any Contract with respect thereto or cause any payments to be due with respect thereto. The conduct of the Business (including the use of any Intangible Property) does not infringe, dilute, misappropriate, impair or otherwise violate ("Infringe") any intellectual property rights of any third Person, and, to the best of Seller's knowledge, no third Person is Infringing upon any of the Intangible Property. There are no pending or, to the best of Seller's knowledge, threatened claims, actions, investigations or legal, administrative or arbitration proceedings (each, a "Claim") that would limit, cancel or question the validity, enforceability, ownership or use of any of the Intangible Property or pursuant to which Seller is alleged to Infringe the intellectual property rights of any third Person.

(e)     Ownership; Condition and Sufficiency of the Assets. Subject to the entry of the Sale Order, Seller has the right to deliver, sell, transfer and assign all of the Assets free and clear of all Encumbrances. Other than the Excluded Assets, the Assets constitute all of the material assets, properties, rights, privileges and interests (i) of Seller used or held for use in the operation or conduct of the Business and (ii) necessary for the operation or conduct of the Business to be consistent with the past custom and practice of the Business.

M KCD 2233375 v21
2910330-000001

(f) <u>Suits, Actions and Claims</u>. There is no outstanding order, rule, verdict, writ, injunction, settlement or decree of any Governmental Authority against or affecting Seller with respect to the Business or the Assets, except as disclosed in Section 5.1(f) of the Seller Disclosure Schedule.

(g) <u>Intellectual Property Assets</u>.

(i) Section 5.1(g)(i) of the Seller Disclosure Schedule contains a complete and accurate list and summary description, including any royalties paid or received by Seller, and Seller has delivered to Buyer accurate and complete copies, of all Seller Contracts relating to the Intellectual Property Assets, except for any license implied by the sale of a product and perpetual, paid-up licenses for commonly available software programs with a value of less than $10,000 under which Seller is the licensee. There are no outstanding and, to Seller's knowledge, no threatened disputes or disagreements with respect to any such Contract.

(ii) Except as set forth in Section 5.1(g)(ii) of the Seller Disclosure Schedule, the Intellectual Property Assets are all those necessary for the operation of Seller's Business as it is currently conducted. As of the Closing Date, Seller shall be the owner or licensee of all right, title and interest in and to each of the Intellectual Property Assets, free and clear of all Encumbrances, and has the right to use without payment to a third party all of the Intellectual Property Assets.

(iii) All former and current employees of Seller who have contributed to any of Seller's inventions, improvements, discoveries or information relating to the business of Seller have executed written Contracts with Seller that assign to Seller all rights to any such inventions, improvements, discoveries or information relating to the business of Seller.

(iv) Seller owns no Patents.

(v) Section 5.1(g)(v) of the Seller Disclosure Schedule contains a complete and accurate list and summary description of all Marks. All Marks have been registered with the United States Patent and Trademark Office, are currently in compliance with all applicable law (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), are valid and enforceable and, except as set forth in Section 5.1(g)(v) of the Seller Disclosure Schedule, are not subject to any maintenance fees or taxes or actions falling due within ninety (90) days after the Closing Date. No Mark has been or is now involved in any opposition, invalidation or cancellation proceeding and, to Seller's knowledge, no such action is threatened with respect to any of the Marks. To Seller's knowledge, there is no potentially interfering trademark or trademark application of any other Person. No Mark is infringed or, to Seller's knowledge, has been challenged or threatened in any way. None of the Marks used by Seller infringes or is alleged to infringe any trade name, trademark or service mark of any other Person. All products and materials containing a Mark bear the proper federal registration notice where permitted by law.

(vi) Seller owns no Copyrights.

(vii) With respect to each Trade Secret, the documentation relating to such Trade Secret is current, accurate and sufficient in detail and content to identify and explain

12

it and to allow its full and proper use without reliance on the knowledge or memory of any individual. Seller has taken all reasonable precautions to protect the secrecy, confidentiality and value of all Trade Secrets (including the enforcement by Seller of a policy requiring each employee or contractor with knowledge of any Trade Secret to execute proprietary information and confidentiality agreements substantially in Seller's standard form, and all current and former employees and contractors of Seller have executed such an agreement). Seller has good title to and an absolute right to use the Trade Secrets. The Trade Secrets are not part of the public knowledge or literature and, to Seller's knowledge, have not been used, divulged or appropriated either for the benefit of any Person (other than Seller) or to the detriment of Seller. No Trade Secret is subject to any adverse claim or has been challenged or threatened in any way or infringes any intellectual property right of any other Person.

(viii)    Section 5.1(g)(viii) of the Seller Disclosure Schedule contains a complete and accurate list and summary description of all Net Names. All Net Names have been registered in the name of Seller and are in compliance with all applicable law. No Net Name has been or is now involved in any dispute, opposition, invalidation or cancellation proceeding and, to Seller's knowledge, no such action is threatened with respect to any Net Name. To Seller's knowledge, there is no domain name application pending of any other person which would or would potentially interfere with or infringe any Net Name. No Net Name is infringed or, to Seller's knowledge, has been challenged, interfered with or threatened in any way. No Net Name infringes, interferes with or is alleged to interfere with or infringe the trademark, copyright or domain name of any other Person.

Section 5.2    Representations and Warranties of Buyer. Except as set forth on the disclosure schedule dated as of this Agreement and executed and delivered by Buyer to Seller concurrently with or prior to the execution and delivery by Buyer of this Agreement (the "Buyer Disclosure Schedule"), Buyer hereby represents and warrants to Seller as of the date hereof as set forth below. Each exception set forth in the Buyer Disclosure Schedule, and any other information included in the Buyer Disclosure Schedule, is identified by reference to, or has been grouped under a heading referring to, a specific individual subsection of this Agreement and shall be deemed to be disclosed solely for purposes of such subsection, except to the extent that disclosure in one subsection of the Buyer Disclosure Schedule is specifically referred to in another subsection of the Buyer Disclosure Schedule by appropriate cross-reference.

(a)    Power and Authority. Buyer has all limited liability company power and authority necessary to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Manager(s) and/or Members of Buyer and no other limited liability company proceedings on the part of Buyer are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Buyer, and, assuming that this Agreement constitutes a valid and binding agreement of Seller, constitutes a valid and binding agreement of Buyer.

(b)    Consents and Approvals, No Violation. Except for the entry and effectiveness of the Sale Order, neither the execution and delivery of this Agreement by Buyer, nor the purchase by Buyer of the Assets and the assumption by Buyer of the Assumed Liabilities

13

and the Assumed Contracts pursuant to this Agreement will: (a) conflict with or result in any breach of any provision of Buyer's organizational documents; (b) require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority which has not otherwise been obtained or made; or (c) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any material note, bond, mortgage, indenture, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which any of its assets may be bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained.

(c) Legal Proceedings and Judgments. There are no material claims, actions, proceedings or investigations pending or, to Buyer's knowledge, threatened against or relating to Buyer before any court or other Governmental Authority acting in an adjudicative capacity that could have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

(d) Brokers. No Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer other than those for which Buyer shall have sole responsibility.

(e) Buyer Financing. As of the Closing Date, Buyer will have funds sufficient to pay the Purchase Price and all of its fees and expenses incurred in connection with the transactions contemplated hereby, including all Cure Amounts and Cure Expenses.

## ARTICLE 6
## COVENANTS OF THE PARTIES

Section 6.1    Conduct of Business.

(a) Except as required by any order (including as to cash collateral) of the Bankruptcy Court or the Bankruptcy Code, during the period commencing on the date of this Agreement and ending on the Closing, Seller shall, in each case taking into account Seller's status as a debtor under Chapter 11 of the Bankruptcy Code, use commercially reasonable efforts to (i) other than as permitted in writing by Buyer, preserve in all material respects the Business, the Assets, its employees and its operations and (ii) endeavor to preserve, in all material respects, the goodwill and relationships with customers, suppliers and others having business dealings with the Business. During such time as Seller continues to operate the Business between the date of execution of this Agreement and the Closing, Seller shall not take any action inconsistent with the transactions contemplated hereby and will not permit any material transactions outside the ordinary course of business without the prior written consent of Buyer.

(b) Prior to the Closing, Seller shall not sell, lease (as lessor), transfer or otherwise dispose of any of the Assets other than sales of Inventory in the ordinary course of business, taking into account Seller's status as a debtor under Chapter 11 of the Bankruptcy Code with respect to such sales of Inventory.

14

Section 6.2    Access to Information; Maintenance of Records. Between the date of this Agreement and the Closing, Seller shall, during ordinary business hours, upon reasonable notice, (i) give Buyer and Buyer's Representatives reasonable access to all books, records, offices and other facilities constituting the Assets or at which the same are located to which Buyer is not denied access by law, (ii) permit Buyer and Buyer's Representatives to make such reasonable inspections thereof as Buyer may reasonably request, and (iii) furnish Buyer with such financial and operating data and other information with respect to the Business as Buyer may from time to time reasonably request; provided, however, that (A) any such access shall be conducted in such a manner so as not to interfere unreasonably with the operation of the Business and shall be at the expense of Buyer and (B) Seller shall not be required to take any action which would constitute a waiver of the attorney-client privilege. Notwithstanding anything in this Section 6.2 to the contrary, Buyer shall not have access to any employee records or other personal and medical records or other records, which in Seller's good faith judgment, are sensitive or the disclosure of which could subject Seller to any risk of liability.

Section 6.3    Expenses. Except to the extent specifically provided herein or in the Sale Order, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses.

Section 6.4    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement, each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws and regulations to consummate and make effective the sale of the Assets in accordance with this Agreement, including using commercially reasonable efforts to ensure (i) timely satisfaction of the conditions precedent to each party's obligations hereunder and (ii) the transfer of the Assets to Buyer. Neither Seller, on the one hand, nor Buyer, on the other hand, shall, without the prior written consent of the other party take any action which would reasonably be expected to prevent or materially impede, interfere with, or delay the transactions contemplated by this Agreement. From time to time, on or after the Closing, Seller shall, at Buyer's expense, execute and deliver such documents to Buyer as Buyer may reasonably request in order to more effectively vest in Buyer Seller's title to the Assets, free and clear of all Claims and Encumbrances. From time to time after the Closing, Buyer shall, at Seller's expense, execute and deliver such documents to Seller as Seller may reasonably request in order to more effectively consummate the sale of the Assets and the assumption and assignment of the Assumed Liabilities and the Assumed Contracts free and clear of all Claims and Encumbrances in accordance with this Agreement.

(b)    In the event that any Asset (including any of the Assumed Contracts) shall not have been conveyed to Buyer at the Closing, Seller shall use its commercially reasonable efforts to convey such Asset (including any of the Assumed Contracts) free and clear of all Claims and Encumbrances to Buyer as promptly as is practicable after the Closing.

(c)    To the extent that Seller's rights under any of the Assumed Contracts may not be assigned without the consent of another Person, which consent Seller has used

15

commercially reasonable efforts to obtain, but nevertheless such consent has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller shall use its commercially reasonable efforts (without being required to make any payment to any third party or to incur any material economic burden and taking into account Seller's status as a debtor under Chapter 11 of the Bankruptcy Code) to obtain any such required consent(s) in respect thereof as promptly as practicable; and Buyer agrees to cooperate with Seller in its efforts to obtain any such consent (including the submission of such financial or other information concerning Buyer and the execution of any assumption agreements or similar documents reasonably requested by a third party) without being required to make any payment to any third party or to incur any economic burden.

Section 6.5    Public Statements.  Seller and Buyer shall consult with each other prior to issuing any press release with respect to this Agreement or the transactions contemplated hereby, except that the parties may make any such disclosure with respect to this Agreement and the transactions contemplated hereby to the extent required by law or by the rules or regulations of any securities exchange or commission and to the extent and under the circumstances in which the parties are expressly permitted by the any confidentiality agreement between the parties to make disclosures of confidential information.

Section 6.6    Governmental Authority Approvals and Cooperation.

(a)    Governmental Authority Approvals.  Seller and Buyer shall each use their commercially reasonable efforts to cooperate with each other in determining and making any filings, notifications and requests for approval required to be made and received prior to the Closing under applicable law or regulation (collectively, the "Regulatory Approvals").  In connection with any Regulatory Approvals, neither Buyer nor Seller will, and Buyer and Seller will use their commercially reasonable efforts to cause their officers, directors, partners or other Affiliates not to, take any action which could reasonably be expected to materially and adversely affect the submission of any required filings or notifications or the grant of any such approvals.

(b)    Cooperation.  Each party hereto (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby and any filing, notification or request for approval related thereto and (ii) shall permit the other party hereto to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto. In addition, neither Seller nor Buyer shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement, the transactions contemplated hereby or any such filing, notification or request for approval related thereto unless it consults with the other party hereto in advance and, to the extent permitted by any such Governmental Authority, gives the other party hereto the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, Seller and Buyer shall furnish Buyer or Seller, as the case may be, with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions

16

contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements and to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval related thereto, with all costs and expenses incurred in connection therewith to be borne by the requesting party. Seller and Buyer shall also furnish the other party hereto with such necessary information and assistance as such other party and its Affiliates may reasonably request in connection with its preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval related thereto, with all costs and expenses incurred in connection therewith to be borne by the requesting party. Seller and Buyer shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective commercially reasonable efforts to obtain the grant thereof as soon as possible.

Section 6.7    Taxes.

(a)    Taxes Related to Purchase of Assets.    The parties recognize and acknowledge that, because the sale, transfer, assignment and delivery of the Assets is being made in connection with Seller's plan of reorganization, they may be exempt under Section 1146(c) of the Bankruptcy Code and the Sale Order from state and local transfer, recording, stamp or other similar transfer taxes (collectively, "Transaction Taxes") that may be imposed by reason of the transaction contemplated by this Agreement; provided, however, that if Transaction Taxes are assessed for any reason, Seller shall pay all such Transaction Taxes along with any recording and filing fees, if applicable.  Buyer and Seller agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement.  At the Closing, Buyer and Seller shall remit to each other such properly completed resale exemption certificates and other similar certificates or instruments as are applicable to claim available exemptions from the payment of sales, transfer, use or other similar taxes under applicable law.  Buyer and Seller will cooperate in preparing such forms and will execute and deliver such affidavits and forms as are reasonably requested by the other party.  Seller shall, if necessary, and Buyer shall cooperate with Seller to seek any determination of the exemption from Transaction Taxes through submitting any dispute thereof to the state and local government unit charged with responsibility for collection or determination of the disputed tax pursuant to Bankruptcy Code Section 1146(d).

(b)    No Withholding.  Except as otherwise required by law, Buyer shall pay the Purchase Price free and clear of withholding or deduction for any Taxes.

(c)    FIRPTA Certification.  Seller shall deliver to Buyer a certification of non-foreign status as described in Section 1.1445-2 of the Treasury Regulations.

(d)    Allocation of Taxes.  Seller shall be liable for all Taxes in respect of the Assets attributable to taxable periods ending on or prior to the Closing.  Seller shall be liable for that portion of all Taxes in respect of the Assets attributable to taxable periods beginning before and ending after the Closing in an amount equal to the product of (i) the amount of such Taxes and (ii) a fraction (A) the numerator of which is the number of days of the relevant taxable period up to and including the Closing and (B) the denominator of which is the total number of

17

days in the relevant taxable period. Buyer shall be liable for all Taxes in respect of Assets that are not the liability of Seller hereunder.

(e)  Allocation of Purchase Price. Buyer and Seller shall (i) attempt in good faith, within thirty (30) days after the Closing, to agree on the allocation of the sum of the Purchase Price, the Cure Amounts and the Assumed Liabilities (and any adjustments thereof) among the Assets as of the Closing Date (the "Allocation") in accordance with Section 1060 of the Code and the Treasury Regulations thereunder and (ii) cooperate in connection with the preparation of Internal Revenue Service Form 8594 for its timely filing with Buyer's and Seller's respective tax returns. Except as otherwise required by applicable law, Buyer and Seller shall report for all Tax purposes all transactions contemplated by this Agreement in a manner consistent with the Allocation, if any, and shall not take any position inconsistent therewith in any Tax Return, in any refund claim, in any litigation or otherwise. If any tax authority challenges the allocations set forth in Buyer's and Seller's Form 8594, the party receiving notice of such challenge shall give the other prompt written notice thereof and the parties shall cooperate in order to preserve the effectiveness of such allocations.

(f)  Tax Returns: Cooperation. Seller, in accordance with applicable law, shall (i) prepare and file on or before the due date or any extension thereof all Tax Returns required to be filed by Seller with respect to taxable periods that end on or before the Closing and (ii) pay all of Seller's respective Taxes shown to be due thereon. There are no Tax-related Encumbrances on any of the Assets and Seller will at its own expense defend and hold harmless Buyer from and against any assertion or assessment of a Tax-related Encumbrance relating to Taxes for periods ending on or before the Closing applied against any of the Assets under the terms of this Agreement. Buyer and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to Seller's operations as is reasonably necessary for the preparation and filing of any Tax Return, for the preparation for and proof of facts during any tax audit, for the preparation for any tax protest, for the prosecution or defense of any suit or other proceeding relating to tax matters and for the answer of any governmental or regulatory inquiry relating to tax matters, with all costs and expenses incurred in connection therewith to be borne by the requesting party.

Section 6.8  Submission of the Sale Motion for Bankruptcy Court Approval. On or before the date that is five (5) days after the date of this Agreement, Seller shall file the Sale Motion, the contents of which shall be subject to the written approval of Buyer and its counsel in their sole discretion.

Section 6.9  Sale Order.

(a)  Seller shall use its reasonable best efforts to obtain an expedited hearing on the Sale Motion and entry of the Sale Order by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code within seven (7) days of filing the Voluntary Petition, which shall contain, among other provisions reasonably requested by Buyer, the following provisions (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Sale Order): (i) the transfers of the Assets by Seller to Buyer (A) are or will be legal, valid and effective transfers of the Assets, (B) vest or will vest Buyer with all right, title and interest of

18

Seller in and to the Assets free and clear of all "Liens" and "Claims" (as defined in Section 101 of the Bankruptcy Code) pursuant to Section 363(f) of the Bankruptcy Code (other than Liens created by Buyer) whatsoever, known or unknown, fixed, liquidated, contingent or otherwise, including, but not limited to, any of Seller's creditors, vendors, suppliers, employees or lessors and any other person that is the holder of one of the Claims (collectively "Claimants") and that Buyer shall not be liable in any way (as successor entity or otherwise) for any Claims that any of the Claimants or any other third party may have against any of Seller, the business of Seller and the Assets and permanently enjoins and restrains the assertion and prosecution of any Claims by Claimants or any other third party against Buyer, Buyer's Affiliates, designees and/or assigns and the ownership, use and operation of the Assets, other than claims on the account of Assumed Liabilities; and (C) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the State of Texas; (ii) all Persons are enjoined from taking any action against Buyer, Buyer's Affiliates (as they existed immediately prior to the Closing) or Seller to recover any claim which such Person has solely against Seller or any of Seller's Affiliates (as they existed immediately following the Closing); (iii) the Bankruptcy Court retains exclusive jurisdiction to interpret, construe and enforce the provisions of this Agreement and the Sale Order in all respects, provided that in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause (iii) or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter; (iv) the provisions of the Sale Order are nonseverable and mutually dependent; (v) the transactions contemplated by this Agreement are undertaken by Buyer and Seller at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of Section 363(m) of the Bankruptcy Code; (vi) a determination that not selling the Assets free and clear of Liens and Claims would impact adversely on Seller's bankruptcy estate; (vii) a determination that a sale of the Assets other than one free and clear of Liens and Claims would be of substantially less benefit to the estate of Seller; (viii) Seller may assign and transfer to Buyer all of Seller's right, title and interest (including common law rights) to all of their intangible property; (ix) approves Seller's assumption and assignment of the Assumed Liabilities pursuant to Sections 363 and 365 of the Bankruptcy Code, defines the relevant cure amounts, identifies the correct version of the contract, enjoins the other party to such Assumed Liabilities from raising after the date of the assumption and assignment that there are any uncured defaults under such contract, holds that any party that may have had the right to consent to the assignment of its respective Assumed Liabilities are deemed to have consented to such assignment as required by Section 365(e)(2)(A)(ii) of the Bankruptcy Code if it fails to object to the assumption and assignment and orders Seller to pay any cure amounts payable to the other parties to the Assumed Liabilities consistent with the terms of this Agreement; (x) provides for the retention of jurisdiction by the Bankruptcy Court to resolve any and all disputes that may arise under this Agreement as between Seller and Buyer, and further to hear and determine any and all disputes between Seller and/or Buyer, as the case may be, and any non-Seller party to, among other things any Assumed Liabilities, concerning inter alia, Seller's assignment thereof to Buyer under this Agreement; (xi) provides for the waiver of so-called "bulk-sale" laws in all necessary jurisdictions; and (xii) provides that the Assumed Liabilities do not include any of Seller's liabilities or obligations relating to any claims, disputes, demands, actions, liabilities, damages, suits in equity, administrative proceedings accounts, costs,

19

expenses, setoffs, contributions, attorneys' fees and/or causes of action of whatever kind or character, whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued.

(b)     If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person or Governmental Authority (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Sellers agree to take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and Buyer agrees to cooperate in such efforts. Each party hereto agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal, provided that nothing herein shall preclude the parties hereto from consummating the transactions contemplated herein if the Sale Order shall have been entered and has not been stayed and Buyer has waived in writing the requirement that the Sale Order be a Final Order, in which event Buyer shall be able to assert the benefits of Section 363(m) of the Bankruptcy Code, as a consequence of which such appeal shall become moot.

(c)     Seller shall cooperate reasonably with Buyer and its representatives in connection with the Sale Order and the related bankruptcy proceedings. Such cooperation shall include, but not be limited to, consulting with Buyer at Buyer's reasonable request concerning the status of such proceedings and providing Buyer with copies of requested pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable in connection with any submission thereof to the Bankruptcy Court. Seller further covenants and agrees that the terms of any plan submitted by Seller to the Bankruptcy Court for confirmation shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Buyer hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement including, without limitation, any transaction that is contemplated by or approved pursuant to the Sale Order.

Section 6.10     Notification of Alternative Offers for the Assets. Unless otherwise agreed or ordered by the Court, Seller shall not seek any other offer or proposal to purchase any of Assets. Seller agrees to notify Buyer in writing not less than two (2) Business Days after receiving any offer or proposal to purchase any of the Assets (including identification of the potential buyer and the proposed purchase price and other material terms) and to provide a copy of such offer or proposal to Buyer.

## ARTICLE 7
## CONDITIONS TO CLOSING

Section 7.1     Conditions to Each Party's Obligations to Effect the Closing. The respective obligations of each party to effect the sale and purchase of the Assets shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a)     No preliminary or permanent injunction or other order or decree by any federal or state court which prevents the consummation of the sale of any material part of the Assets contemplated hereby shall have been issued and remain in effect (each party agreeing to use its commercially reasonable efforts to have any such injunction, order or decree lifted) and

20

no statute, rule or regulation shall have been enacted by any Governmental Authority which prohibits the consummation of the sale of the Assets;

(b)     The Bankruptcy Court shall have entered the Sale Order in form and substance satisfactory to Buyer, such Sale Order shall be in full force and effect and shall not have been stayed, modified, reversed or amended (except if modified or amended with the written consent of Seller and Buyer); and

(c)     The Sale Order shall provide that transactions contemplated hereby shall be exempt from Transaction Taxes.

Section 7.2     Conditions to Obligations of Buyer.  The obligation of Buyer to effect the purchase of the Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following additional conditions:

(a)     Seller shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by Seller on or prior to the Closing (including, without limitation, delivery of each of the items referenced in Section 4.2 above) and the representations and warranties of Seller which are set forth in this Agreement shall be true and correct as of the date of this Agreement and as of the Closing (except to the extent that any such representation or warranty speaks as of a particular date) as though made at and as of the Closing;

(b)     Buyer shall have received a certificate from an authorized officer of Seller's general partner, dated as of the Closing, to the effect that the conditions set forth in Section 7.2(a) above have been satisfied;

(c)     the Sale Order provides that any and all of the Encumbrances on the Assets shall, upon Closing, attach only to the proceeds of the transactions contemplated hereby and not to the Assets;

(d)     Buyer shall have received the other items to be delivered to it pursuant to Section 4.2 above;

(e)     The sale of the Assets to Buyer shall have been authorized and approved by the Bankruptcy Court in the Sale Order, which shall be acceptable in form and substance to the Buyer in its sole discretion and shall be a Final Order; and

(f)     Buyer shall have been permitted to engage in discussions with such of Seller's customers (including without limitation Seller's Substantial Customers) as Buyer deems appropriate, in Buyer's sole discretion, and based on such discussions or otherwise, Buyer shall be satisfied in its sole discretion that Buyer shall be able to or likely to retain the portion of Seller's Business relating to Seller's Substantial Customers after the Closing.

Any condition specified in this Section 7.2 may be waived by Buyer; provided, however, that no such waiver shall be effective against Buyer unless it is set forth in a writing executed by Buyer.

M KCD 2233375 v21
2910330-000001

Section 7.3    Conditions to Obligations of Seller.  The obligation of Seller to effect the sale of the Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following additional conditions:

(a)    Buyer shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by Buyer on or prior to the Closing and the representations and warranties of Buyer which are set forth in this Agreement shall be true and correct as of the date of this Agreement and as of the Closing (except to the extent that any such representation or warranty speaks as of a particular date) as though made at and as of the Closing;

(b)    Seller shall have received a certificate from an authorized officer of Buyer, dated as of the Closing Date, to the effect that the conditions set forth in Section 7.3(a) above have been satisfied; and

(c)    Seller shall have received the other items to be delivered to it pursuant to Section 4.3 above.

Any condition specified in this Section 7.3 may be waived by Seller; provided, however, that no such waiver shall be effective against Seller unless it is set forth in a writing executed by Seller.

## ARTICLE 8
## TERMINATION

Section 8.1    Termination.

(a)    General Termination Rights.  This Agreement may be terminated at any time prior to the Closing upon the written agreement of both parties or, upon the election of either party in the event that (i) there shall be any law or regulation that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited or (ii) consummation of the transactions contemplated hereby would violate any non-appealable final order, decree or judgment of (A) the Bankruptcy Court or (B) any court or Governmental Authority having competent jurisdiction.

(b)    Buyer's Termination Rights.  Subject to Section 8.3 below, Buyer shall have the right to terminate this Agreement as follows:

(i)    In the event that the Bankruptcy Court does not approve the Sale Motion (including, without limitation, approving the termination and termination fee provisions set forth in Section 8.3 below) which results in the issuance of the Sale Order in form and substance satisfactory to Buyer in all material respects on or prior to 5:00 p.m., Central Daylight Time, on June 19, 2011; provided, however, that Buyer shall not have the right to terminate this Agreement pursuant to this Section 8.1(b)(i) if the failure to obtain the Sale Order within such time period results primarily from Buyer breaching any representation, warranty or covenant contained in this Agreement);

22

(ii)     In the event that the Bankruptcy Court approves a Superior Offer and (A) a period of forty-five (45) days elapses following the date of such approval or (B) the Superior Offer is consummated (i.e., the transaction contemplated by the Superior Offer closes);

(iii)     In the event that Seller materially breaches its obligations under this Agreement and fails to cure such breach within fifteen (15) days of notice of such breach; or

(iv)     In the event that the transactions contemplated by this Agreement have not been consummated by June 30, 2011.

(c)     Seller's Termination Rights.  Subject to Section 8.3 below, Seller shall have the right to terminate this Agreement as follows:

(i)     In the event that the Bankruptcy Court approves a Superior Offer that is consummated (i.e., the transaction contemplated by the Superior Offer closes); or

(ii)     In the event that Buyer materially breaches its obligations under this Agreement and fails to cure such breach within fifteen (15) days of notice of such breach.

(d)     Limitations on Right to Terminate.  Except as expressly set forth herein, neither party shall have the right to terminate this Agreement.

Section 8.2     Procedure and Effect of Termination.  In the event of termination of this Agreement by either or both of the parties pursuant to Section 8.1 above, written notice thereof shall forthwith be given by the terminating party to the other party and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto. If this Agreement is terminated as provided herein: (i) all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the Governmental Authority or other Person to which they were made; and (ii) Diligence Materials in the possession of Buyer or its Affiliates shall promptly be returned to Seller.

Section 8.3     Certain Payments Upon Termination and Upon the Occurrence of a Superior Offer.  In addition to the obligations described in Section 8.2 above, the parties shall have the following rights and obligations in the event of a termination of this Agreement or in the event of the occurrence of a Superior Offer:

(a)     Certain Terminations by Buyer.

(i)     In the event of a termination of this Agreement by Buyer pursuant to Section 8.1(a) above (A) neither Buyer nor Seller shall have any further obligation to the other party and (B) the Good Faith Deposit shall be returned to Buyer, without deduction of any kind.

(ii)     In the event of a termination of this Agreement by Buyer pursuant to Section 8.1(b)(i) or Section 8.1(b)(iv) above and Seller has exercised commercially reasonable efforts to obtain the approvals described in Section 8.1(b)(i), (A) neither Buyer nor Seller shall have any further obligation to the other party and (B) the Good Faith Deposit shall be returned to Buyer, without deduction of any kind.

23

(iii)     In the event of a termination of this Agreement by Buyer pursuant to Section 8.1(b)(i) or Section 8.1(b)(iv) above and Seller has not exercised commercially reasonable efforts to obtain the approvals described in Section 8.1(b)(i) or in the event of a termination of this Agreement by Buyer pursuant to Section 8.1(b)(iii) above, (A) Seller shall remit the Reimbursement Fee to Buyer within two (2) Business Days of the date of termination, and (B) the Good Faith Deposit shall be returned to Buyer, without deduction of any kind. For the avoidance of doubt, a termination by Buyer as a result of the material non-performance by Seller of the terms of this Agreement in connection with the occurrence of a Superior Offer shall not be deemed to be a termination under Section 8.1(b)(iii) and shall be subject to Section 8.3(c) below.

(b)     Certain Terminations by Seller.

(i)     In the event of a termination of this Agreement by Seller pursuant to Section 8.1(a) above (A) neither Buyer nor Seller shall have any further obligation to the other party and (B) the Good Faith Deposit shall be returned to Buyer, without deduction of any kind.

(ii)     In the event of a termination of this Agreement by Seller pursuant to Section 8.1(c)(ii) above, (A) except as provided by clause (B) of this Section 8.3(b)(ii), neither Buyer nor Seller shall have any further obligation with respect to the other party and (B) Seller shall be entitled to receive the Good Faith Deposit as liquidated damages.

(c)     Certain Payments Upon the Occurrence of a Superior Offer.  In the event that the Bankruptcy Court approves a Superior Offer, upon approval by the Bankruptcy Court of the Superior Offer, Seller shall pay Buyer, within one (1) Business Day of such approval, the sum of Thirty Thousand Dollars ($30,000.00) plus the Reimbursement Fee.

Section 8.4     Extension; Waiver.  At any time prior to the Closing, Seller, on the one hand, or Buyer, on the other hand, may (i) extend the time for the performance of any of the obligations or acts of the other party, (ii) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered pursuant hereto, (iii) waive compliance with any of the agreements of the other party contained herein or (iv) waive any condition to its obligations hereunder. Any agreement on the part of Seller, on the one hand, or Buyer, on the other hand, to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of Seller or Buyer, as applicable.

### ARTICLE 9
### MISCELLANEOUS PROVISIONS

Section 9.1     Amendment and Modification.  This Agreement may be amended, modified or supplemented only by written agreement of Seller and Buyer.

Section 9.2     Waiver of Compliance; Consents.  Except as provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant or condition herein may be waived by the party or parties entitled to the benefits thereof only by a written instrument signed by the party or parties granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, or condition shall not operate as a waiver of, or estoppel with respect to any subsequent or other failure.

24

Section 9.3    Survival.  The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and neither of the parties or their Affiliates nor any of their or their Affiliates' respective officers, directors, managers, representatives, employees, shareholders, partners, members, advisors or agents shall have any liability to the other after the Closing for any breach thereof. The parties hereto agree that only the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

Section 9.4    No Impediment to Liquidation.    Nothing herein shall be deemed or construed as to limit, restrict or impose any impediment to Seller's right to liquidate, dissolve and wind-up its affairs and to cease all business activities and operations at such time as it may determine following the Closing.

Section 9.5    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given (i) when personally sent/delivered or by facsimile transmission (with hard copy to follow), (ii) the next business day when sent by reputable express courier or (iii) five (5) Business Days following mailing by registered or certified mail postage prepaid and return receipt requested. Unless another address is specified in writing, notices, demands and communications to Seller and Buyer shall be sent to the addresses indicated below:

     (a)    If to Buyer, to:

           Monogram Licensing, LLC
           930 South White Station
           Memphis, Tennessee 38117
           Attention: Wes Jackson
           Facsimile: (901) 259-6671

           with a copy to:

           Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
           165 Madison Avenue, Suite 2000
           Memphis, Tennessee 38103
           Attention:  Robert J. DelPriore
           Facsimile: (901) 577-4271

     (b)    If to Seller, to:

           TransPecos Foods, LP
           2 Spencer Road
           Boerne, Texas 78006
           Attention: Gary Candy
           Facsimile: (830) 249-8231

           with a copy to:

25

Kennedy, Toppin & Sutherland, LLP
112 East Pecan Street, Suite 800
San Antonio, Texas 78205
Attention: Bruce E. Toppin, III
Facsimile: (210) 228-0781

Section 9.6   Assignment.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either party, including by operation of law, without the prior written consent of the other party; provided, however, that this Agreement shall be assignable by Buyer, without the prior written consent of Seller so long as Buyer shall continue to remain obligated hereunder prior to Closing and provide Seller written notice of such assignment.  Any assignment of this Agreement or any of the rights, interests or obligations hereunder in contravention of this Section 9.6 shall be null and void and shall not bind or be recognized by Seller or Buyer.

Section 9.7   Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 9.8   Governing Law.  This Agreement shall be governed by the laws of the State of Texas, without giving effect to the principles of conflicts of laws thereof.

Section 9.9   Submission to Jurisdiction.  Unless and to the extent otherwise specifically provided herein, the parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute or proceeding brought in such courts or any defense of inconvenient forum in connection therewith.

Section 9.10   Counterparts.  This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which, when executed and delivered, shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

26

Section 9.11   Incorporation of Exhibits.  All Schedules and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 9.12   Entire Agreement.   This Agreement (including all Schedules and all Exhibits) constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the parties with respect thereto; provided, however, that the terms of any confidentiality agreement executed in connection with Buyer's investigation and due diligence of the Assets shall survive execution of this Agreement, and shall not be assigned by operation of law or otherwise.

Section 9.13   Bulk Sales or Transfer Laws.  Buyer hereby waives compliance by Seller with the provisions of the bulk sales or transfer laws of all applicable jurisdictions. Seller agrees to cooperate with Buyer, at Buyer's expense, in making any such bulk sales filings upon the reasonable request of Buyer.

Section 9.14   Headings.   The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

M KCD 2233375 v21
2910330-000001

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

**MONOGRAM LICENSING, LLC**

By: _____

Name: Karl A Schledwitz

Title: CEO

**TRANSPECOS FOODS, LP**

By:    TPF GP, LLC, its General Partner

By: _____

    Gary Candy, Manager

M KCD 2233375 v21
2910330-000001

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written by their respective officers thereunto duly authorized.

MONOGRAM LICENSING, LLC

By: _____

Name: _____

Title: _____

TRANSPECOS FOODS, LP

By:    TPF GP, LLC, its General Partner

By:

_____
Gary Candy, Manager

Schedule 1.1(a)
List of Assets

**Line 1**

**AW 102 Bin Dumper**
**Aw 003 Martin Peeler**
**AW 033 Goring Slicer**
**AW 231 Goring Slicer**
**AW 469 Goring Slicers**
**AW 301 Martin Work Platform**
**AW 474 Conveyors to Flume**
**No numbers Flume (Water Bath)**
**No numbers Martin Conveyor transfer**
**No Numbers Martin Conveyor Transfer**
**AW 478 Feed Hopper to Key Shaker**
**Transfer Conveyor to into Key shaker**
**Shaker with Screens (Key)**
**AW 473 Inspection Conveyor (send Sort)**
**B2A10363 Onion Waste Conveyor**
**Work Platform one**
**TP 036 ABC Batter Controllers #1**
**TP 041 ABC Batter Controller #2**
**AW 0112 Top Submerger Batter Applicator**
**AW 081Stein Breader**
**AW 015 Stein Breader**
**TP 037 ABC Batter Controller**
**Work Platform two**
**AW 482 Drying Conveyor**
**TP 010 Fryer Filter**
**AW 318 Stein Fryer**
**AW 321 Day Tank**
**No numbers Day Tank #2 Enron & Gee, Inc.**
**AW 436 Discharge Conveyor**
**No Numbers Fryer Sediment Conveyor Discharge of Stein Fryer**
**AW 109 Fryer conveyor # 2**
**Frigoscandia Line 1**
**AW 327 Discharge conveyor**
**AW 328 Methocell Conveyor**
**AW 491 Metal Detector**
**AW 033 Sending Belt**
**AW 034 Sending Conveyor**
**No Numbers Rework Conveyors Laughlin Corp.**
**AW 038 Rework Conveyor**
**Spiral Packaging Bypass Chute**
**No numbers In feed conveyor to Ishida and all conveyors going too the**
**Ishidas**
**Ishida CCWM214WS/70/WP**
**Pacmac Mdl. 9500**
**Scale Platform**

Discharge Conveyor from Pacmac (Incline)
Safe Line Power plus Metal Detector
Pack out Conveyors
MSD 22-2 Case Taper SS# 061224 Best Pack
MSD 22-2 Case Taper SS# 051117 Best Pack
No Numbers A -One MFG Mixer
No numbers Screw Blancher for Corn production
No numbers A -One MFG Mixer Work Platform
Adco with Adco Extension 56" x 71/4"

Line 2

AW 039  Bin  Dumper
AW 302  Martin Peeler
AW 292 Martin Peeler
AW 101 Martin Platform
AW 379 Onion Transfer Conveyor
AW 148 Goring Slicer
Aw 032 Goring Slicer
AW 149 Goring Slicer
AW 044 Incline Conveyor to Lycol
8900 Rotary Blancher Lycol BMIRBD612OA-39036
Aw 332 Lycol Discharge Conveyor
AW 309 Wilcox Separator
4356231 Key Shaker
AW 208 Send Sort Conveyor
Waste incline belt
Work Platforms form employees 2 each
AW 467 S Stein ABC batter controller # 1
AW 011 Stein ABC batter controller # 2
NO numbers 50 Gallon SS# L9041 Batter Mixer
AW 212 Infeed Flat Flex Conveyor
AW014 TS  Top Submerger Stein Batter Applicator
AW 013 Stein Breader
TP 032 Stein Breader
AW 0110 Stein Batter Applicator Top Submerger
Stein Batter Applicator
Stein Breader
AW 315 Drying Conveyor before fryer
Stein Fryer ABJ Wiring Diagram
No numbers MP Filter system
No Numbers Day oil storage tank
AW 323 Fryer discharge conveyors # 1
AW 016 Fryer discharge conveyor # 2
Frigo GCP 76 29 TiersJBT Belt Drive (New) PSO# 583-604626
JBT Fan Motors (New)
Discharge conveyors post Frigo to Ishida scales
Spiral Packaging Bypass Chute
AW 339 Discharge conveyor after Packmac (incline)
No Numbers Pack out Conveyor after Pacmac

**No Numbers RBO Conveyors 180 degree RBO Conveyor infeed to pack off conveyor**
**AW 017RBO Pack Out conveyor**
**AW 018 Sending Conveyor attached to the pack off conveyor**
**AW 471 Weigher Conveyor**
**AW 027 Finish Carton Conveyor**
**AW 023 Scale Table**
**AW 024 Scale Table**
**AW 025 Scale Table**
**Water Chiller Chester Jensen XB12-OT-8-32 Size 9759**
**Ritz Grinder**
**Pallet of Key Sizing Screens**
**Adco with pack off table and conveyors**
**MDL USA 2024-SB Inter Pack Case Taper**


**Other Equipment**

**Bagger Forming Tubes for Pak Mac**
**2 18" Allen Shaker Conveyors**
**Conveyor aw0334**
**Spare belting for the Friogoscandia Gyro freezers**
**Central Blower system for Air Knives (3 units)**
**Central Hydraulic Power system - 2 units**
**50-100 Grinder**
**PM3 Batter Mixer**
**Stein Submerger Conveyor**
**Gurotte**
**All Corn Nugget Equipment to include:**
**Tote dumper**
**Receiving / Transfer Bin**
**Blender on Weigh Cells**
**Auger Feed Conveyor**
**10 head extruder with 4 sets of extruder heads**
**Urshell CC Dicer**

## Schedule 1.1(b)
## Assumed Contracts

| Contract | Cure Payment | Deposits, Advances and Credits, Security Deposits | Letters of Credit |
|---|---|---|---|
| None | | | |
| | | | |

Schedule 5.1(f)
Suits Actions and Claims

1. Informal Settlement Agreement between Seller and U.S. Department of Labor, Occupational Safety and Health Administration dated on or about March 31, 2010.

2. Rule 11 agreement between Pecos-Barstow-Toyah Independent School District, et al. and TransPecos Foods, LP dated June 3, 2011 regarding the payment of personal property tax liabilities.

## Schedule 5.1(g)(i)
### List and summary description of all Seller Contracts relating to the Intellectual Property Assets

1. Great Plains inventory management software licensing agreement.

Schedule 5.1(g)(ii)
Intellectual Property Assets necessary for the operation of Seller's Business as it is currently conducted not utilized by Seller.

None.

## Schedule 5.1(g)(v)
### List and summary description of all of Seller's Marks.

1. <u>TransPecos Foods</u> – IC 029. US 046. G & S: Appetizers; namely, breaded mozzarella cheese sticks, stuffed jalapenos, corn nuggets, broccoli and cheese bites, onion rings, onion and pepper slivers, processed breaded or battered mushrooms, breaded zucchini and battered okra. FIRST USE: 20020429. FIRST USE IN COMMERCE: 20020429; IC 030. US 046. G & S: Corn fritters; apple fritters; IC 031. US 001 046. G & S: Raw onion and pepper slivers.
2. <u>Pecos Valley Farms</u> – IC 029. US 046. G & S: breaded, partially fried, partly prepared, prepared, ready-to-eat and frozen onion rings and other vegetables. FIRST USE: 20050203. FIRST USE IN COMMERCE: 20050203.

Post-registration filing of affidavits of use and incontestability and renewal applications for Pecos Valley Farms mark have not yet been filed; the filing period began on May 9, 2011.

## Schedule 5.1(g)(viii)
### List and summary description of all of Seller's Net Names.

1. transpecosfoods.com.

Exhibit 4.2(a)
Bill of Sale

*See attached.*

# BILL OF SALE

## JUNE ___, 2011

1.      <u>Sale and Transfer of Assets and Contract Rights</u>. For good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, and as contemplated by Section 4.2(a) of that certain Asset Purchase Agreement dated as of June 9, 2011 (the "<u>Purchase Agreement</u>"), to which **TRANSPECOS FOODS, LP**, a Texas limited partnership ("<u>Seller</u>"), and _____ ("<u>Buyer</u>"), are parties, Seller hereby sells, transfers, assigns, conveys, grants and delivers to Buyer, effective as of 12:01 a.m. (central time) as of the date hereof, all of Seller's right, title and interest in and to the Assets (the "<u>Transferred Items</u>").

2.      <u>Further Actions</u>. Subject to the disclosures and limitations in the Purchase Agreement, Seller covenants and agrees to warrant and defend the sale, transfer, assignment, conveyance, grant and delivery of the Transferred Items hereby made against all persons whomsoever, to take all steps reasonably necessary to establish the record of Buyer's title to the Transferred Items and, at the request of Buyer, to execute and deliver further instruments of transfer and assignment and take such other action as Buyer may reasonably request to more effectively transfer and assign to and vest in Buyer each of the Transferred Items, all at the sole cost and expense of Seller.

3.      <u>Terms of the Purchase Agreement</u>. The terms of the Purchase Agreement, including but not limited to Seller's representations, warranties, covenants, agreements and indemnities relating to the Transferred Items, are incorporated herein by this reference. Seller acknowledges and agrees that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.      <u>Capitalized Terms</u>. Capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Purchase Agreement.

**[Signature Page Follows]**

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the first date written above.

SELLER:

TRANSPECOS FOODS, LP

By:    TPF GP, LLC, its General Partner

By:

_____

Gary Candy, Manager

M KCD 2235220 v3
2910330-000001

Exhibit 4.2(e)
Assumption Agreement

*See attached.*

# ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "<u>Assignment and Assumption Agreement</u>") is made and entered into as of June ___, 2011, by and between **TRANSPECOS FOODS, LP**, a Texas limited partnership ("<u>Assignor</u>"), and _____ ("<u>Assignee</u>").

**WHEREAS**, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of June 9, 2011 (the "<u>Purchase Agreement</u>"), pursuant to which Assignee has purchased certain Assets from Assignor; and

**WHEREAS**, pursuant to the Purchase Agreement and as contemplated by Section 4.2(e) therein, Assignor has agreed to assign certain rights and agreements to Assignee, and Assignee has agreed to assume certain obligations of Assignor, as set forth herein.

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.     <u>Capitalized Terms</u>.  Capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Purchase Agreement.

2.     <u>Assignment and Assumption</u>.  Effective as of 12:01 a.m. (central time) as of the date hereof (the "<u>Effective Time</u>"), Assignor hereby assigns, sells, transfers and sets over (collectively, the "<u>Assignment</u>") to Assignee all of Assignor's right, title, benefit, privileges and interest in and to (i) the Assets, wherever situated and of whatever kind and nature, tangible or intangible, whether or not reflected on the books and records of Assignor, and (ii) all of Assignor's burdens, obligations, and liabilities in connection with each of the Assumed Liabilities.  Assignee hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants and to pay and discharge all of the liabilities of Assignor to be observed, performed, paid or discharged from and after the Closing in connection with the Assumed Liabilities.  Assignee assumes no Retained Liabilities, and the parties hereto agree that all such Retained Liabilities shall remain the sole responsibility of Assignor.

3.     <u>Terms of the Purchase Agreement</u>.  The terms of the Purchase Agreement, including but not limited to Assignor's representations, warranties, covenants, agreements and indemnities relating to the Assumed Liabilities, are incorporated herein by this reference. Assignor acknowledges and agrees that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.     <u>Further Actions</u>.  Each of the parties hereto covenants and agrees, at its own expense, to execute and deliver, at the request of the other party hereto, such further instruments of transfer and assignment and to take such other action as such other party may reasonably request to more effectively consummate the assignments and assumptions contemplated by this Assignment and Assumption Agreement.

IN WITNESS WHEREOF, the parties have executed this Assignment and Assumption Agreement as of the date first above written.

ASSIGNOR:

TRANSPECOS FOODS, LP

By:   TPF GP, LLC, its General Partner

By:

_____

Gary Candy, Manager

ASSIGNEE:

_____

By:   _____

Name:  _____

Title:   _____

Signature Page to Assignment and Assumption Agreement

Exhibit 4.2(f)
Supply Agreement

*See attached.*

## SUPPLY AND MANUFACTURING AGREEMENT

**THIS SUPPLY AND MANUFACTURING AGREEMENT** (this "Agreement"), dated as of June _____, 2011 (the "Effective Date"), is made by and between **TRANSPECOS FOODS, LP**, a Texas limited partnership ("Supplier"), and _____, a _____ ("Purchaser"). Supplier and Purchaser are sometimes hereinafter referred individually as a "Party" and collectively as the "Parties."

## RECITALS

**WHEREAS**, Supplier sold Purchaser certain Assets (defined below) of Supplier's business relating to the production of frozen food appetizers pursuant to that certain Asset Purchase Agreement dated as of June 9, 2011 ("Purchase Agreement") and that certain order entered by the Bankruptcy Court (defined below) approving the Supplier's motion and the sale of the Assets under Section 363 of the Bankruptcy Code (defined below) (the "Asset Sale");

**WHEREAS**, Supplier has agreed to continue to conduct certain manufacturing operations of its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code, and Purchaser has agreed to finance and supply all materials required for such manufacturing operations, to avoid further disruption of the business during the transition of the Assets from Supplier to Purchaser;

**WHEREAS**, the entry into this Agreement is a condition to the consummation of the Asset Sale; and

**WHEREAS**, the Parties desire to set forth the terms and conditions relating to the continuation of manufacturing operations by Supplier in connection with the Asset Sale.

**NOW, THEREFORE**, in consideration of the terms and conditions set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Definitions.  For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1:

"Affiliate" means, with respect to a Person, an entity directly or indirectly controlling, controlled by or under common control with such Person.

"Agreement" has the meaning set forth in the preface above.

"Assets" has the meaning set forth in the Purchase Agreement.

"Asset Sale" has the meaning set forth in the Recitals of this Agreement.

"Bankruptcy Code" means Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

"Bankruptcy Court" means the United States Bankruptcy Court for the Western District of Texas.

"City Bank" has the meaning set forth in Section 2(g)(v).

"Confidential Information" has the meaning set forth in Section 14(a).

"Direct Payments" has the meaning set forth in Section 6(a).

"Effective Date" has the meaning set forth in the preface above.

"FFDC Act" has the meaning set forth in Section 9(b).

"Manufacturing Operations" has the meaning set forth in Section 2(a).

"Materials" has the meaning set forth in Section 2(b).

"Operating Expenses" has the meaning set forth in Section 2(g).

"Operating Permits" means all licenses, permits, quotas, authorizations, franchises, registrations, variances, exceptions and other approvals from any governmental authority or from any private party necessary for Supplier to fulfill its obligations under this Agreement.

"Party" and "Parties" have the meaning set forth in the preface above.

"Payments" means the payments that Purchaser is obligated to pay to Supplier pursuant to this Agreement.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or government, political subdivision, agency or instrumentality of a government.

"Products" has the meaning set forth in Section 2(a).

"Proposition 65" has the meaning set forth in Section 9(b).

"Purchase Agreement" has the meaning set forth in the Recitals of this Agreement.

"Purchaser" has the meaning set forth in the preface above.

"Purchaser Indemnified Parties" means Purchaser and its respective Affiliates and the members, directors, officers, agents, employees, Affiliates and professionals of Purchaser and its respective Affiliates, and any assignees, transferees or successors-in-interests of the foregoing as to their respective interests hereunder.

"Statement" has the meaning set forth in Section 6(b).

"Supplier" has the meaning set forth in the preface above.

2