"Supplier Indemnified Parties" means Supplier and its respective Affiliates and the general partner, officers, agents, employees, Affiliates and professionals of Supplier and its respective Affiliates.

"Tax" and Taxes" means all taxes, charges, fees, levies or other assessments imposed by any federal, state, local or foreign taxing authority, whether disputed or not, including, without limitation, income, capital, estimated, alternative or add-on minimum, excise, property, sales, transfer, withholding, employment, payroll, gross receipts, windfall profits, license, severance, stamp, occupation, environmental, customs duties, capital stock, value added and franchise taxes and such terms shall include any interest, penalties or additions attributable to or imposed on or with respect to such assessments, including any obligation to indemnity or otherwise assume or succeed to the Tax liability of any other person.

"Term" has the meaning set forth in Section 3.

2.      Supply Relationship.

(a)      During the Term, Supplier shall manufacture, sell and ship the products identified on Schedule 2(a) attached hereto (collectively referred to herein as the "Products") in accordance with the provisions of this Agreement to Purchaser or its customers as designated in writing from time to time by Purchaser. Such Products shall be shipped from Supplier's facility in Pecos, Texas in the condition as warranted under this Agreement. Supplier shall not conduct any operations at its facility other than those necessary to produce the Products. (Supplier's obligations under this Section 2(a) shall be referred to herein as the "Manufacturing Operations.")

(b)      Purchaser shall supply, or at its sole cost and expense cause to be supplied, all raw materials, packing supplies, labels, boxes and all other supplies and materials (collectively, the "Materials") to Supplier to be used or consumed by the Manufacturing Operations.

(c)      Supplier shall supply all machinery, equipment, tools, fixtures and spare parts, including without limitation boilers, air and refrigeration compressors, wastewater handling and treatment equipment (collectively the "Equipment") to be used by Supplier in providing the Manufacturing Operations, provided, however, that to the extent any portion of the Equipment is included in the Assets, Purchaser hereby agrees that such Assets shall remain at Supplier's facility, and Supplier is hereby granted the right to use such Equipment to the extent necessary to perform the Manufacturing Operations during the Term for no additional consideration. Supplier represents and warrants to Purchaser that the Equipment presently located at Supplier's facility is sufficient to enable Supplier to provide the Manufacturing Operations during the Term consistent with Supplier's operations prior to the Effective Date. Any Equipment not otherwise already owned by Supplier or used by Supplier according to the foregoing that Supplier and Purchaser agree shall be necessary for Supplier's performance hereunder after the Effective Date shall be procured by and at the sole expense of Purchaser, provided that such Equipment shall be owned by Purchaser and shall be subject to removal from Supplier's facility upon the expiration of the Term.

3

(d)     Purchaser shall deliver to Supplier purchase orders each week during the Term, which shall set forth the requirements for the subsequent week's production of the Products.

(e)     Subject to the relevant provisions of the Perishable Agricultural Commodities Act of 1930, as amended, and regulations thereunder, Purchaser shall own all rights, title and interest in and to the Products produced by the Manufacturing Operations. Supplier shall not divert, sell, resell or salvage, directly or indirectly, any of the Products or Materials to any third party.

(f)     All employees of Supplier employed or re-employed, as the case may be, by Supplier in connection with Supplier's performance under this Agreement, shall remain at all times employees of Supplier, provided that Purchaser shall provide for Supplier's payment of wages and benefits to the employees identified on Schedule 2(g)(i) (the "Retained Employees") in accordance with Section 2(g)(i) below, and shall have no responsibility or liability, financial or otherwise, with respect to any of Supplier's employees other than the Retained Employees. Supplier agrees that changes to the compensation or employment status of the Retained Employees shall be, during the Term, subject to the written consent of Purchaser, which may not be unreasonably withheld. Supplier shall have the right, but not the obligation, at any time during the Term to hire on its own behalf employees, or to assign its existing employees, to function in managerial and consultative capacities, the expenses associated with whom shall be borne solely by and shall be the responsibility of Purchaser.

(g)     Purchaser shall advance payment on Supplier's behalf or reimburse Supplier, as applicable, but shall in no event become primarily liable for, the following expenses related to Supplier's performance of the Manufacturing Operations, and no other expenses except upon the prior mutual agreement of Purchaser and Supplier (collectively, the "Operating Expenses"):

(i)     Subject to the provisions of Section 13(a), the monthly salaries, pro-rated if applicable, and hourly wages earned by the Retained Employees based on the salaries and wages of such Retained Employees set forth on the attached Schedule 2(g)(i), as well as a pro rata portion of any insurance benefits of the Retained Employees pursuant to the benefit plans of Supplier existing immediately prior to the Effective Date, as described (by type of plan and amounts payable) on Schedule 2(g)(i), provided, however, that in no event shall Purchaser pay or have any responsibility under this Agreement to pay, any severance, separation or other termination costs related to any employee of Supplier, regardless of the basis for such payment;

(ii)     The cost of utilities incurred during the Term of this Agreement, or any deposit required by any utility company for Supplier to conduct the Manufacturing Operations after filing for bankruptcy, provided that any such deposit paid by Purchaser shall remain the property of Purchaser and shall be remitted directly to Purchaser by such utility at the end of the Term;

4

(iii)   The cost to maintain the insurance carried by Supplier as of the Effective Date (as described by policy, carrier and coverage limits on Schedule 2(g)(iii)) pro rated for each month during the Term of this Agreement, provided that Purchaser shall be named as an additional insured on any such policies of insurance;

(iv)   All rental payments incurred during the Term under the Equipment leases described (including the identity of the equipment lessor, the specific Equipment subject to such lease, and the monthly payments thereunder) on Schedule 2(g)(iv), provided that if any such rental payments are for other than a monthly period, such rental payments shall be pro rated for each month during the term;

(v)   For each calendar month, or pro rated portion thereof, during which Supplier conducts Manufacturing Operations under this Agreement, a monthly amount equal to Eighty-Two Thousand Dollars ($82,000) (or pro-rated portion thereof) representing a portion of amounts owed to City Bank, Lubbock, Texas ("City Bank"), which amount shall be paid by Supplier to City Bank (or at the direction of City Bank, with approval of the Bankruptcy Court, directly to City Bank;

(vi)   Any and all Taxes payable with respect to and for the time period represented by the Term or Supplier's provision of the Manufacturing Operations during the Term, provided that for any Taxes payable with respect to any time period that includes the Term or any portion of the Term and another time period that started before or ends after the Term, Purchaser's responsibility under this Section 2(g)(vi) shall be limited to the pro rata portion of such Tax liability that corresponds to the Term; and

(vii)   Should any Equipment break down and require repair or otherwise require ordinary and routine maintenance during the Term, the cost of such repairs and maintenance.

3.   Term.  The term of the Agreement shall be for the period commencing on the Effective Date and ending on December 31, 2011, unless terminated earlier pursuant to Section 11 (the "Term").

4.   Pricing Terms.  Payment to be made by Purchaser pursuant to Section 2(g) shall constitute payment in full for the Products to be produced in accordance with this Agreement.

5.   Deliveries.  All Products shall be delivered F.O.B. Supplier's dock in Pecos, Texas. Notwithstanding the foregoing, all Materials, work-in-progress, finished goods and other inventory shall at all times remain the sole property of Purchaser.

6.   Statements and Payments.

(a)   In the case of any direct payment required by Supplier to non-Affiliated third parties in connection with the provision of the Manufacturing Operations, for which

5

Supplier would have the right to reimbursement under Section 2(g), Supplier may submit the invoice from such third party to Purchaser, and Purchaser shall pay such invoice directly to such third party on Supplier's behalf in accordance with the terms of such invoice (collectively, "Direct Payments").

(b)     Within five (5) business days after the end of each calendar week (Sunday to Saturday) during the Term, Supplier shall submit to Purchaser, in a format mutually agreed upon by the Parties, full and accurate statements showing the Operating Expenses incurred by Supplier during the preceding week, including all Direct Payments (each, a "Statement"). Such Statements shall also include any additional information kept in the normal course of business by Supplier, which is appropriate to enable an independent determination of the amount due hereunder.

(c)     Payments. Purchaser shall remit to Supplier all Payments due to Supplier as indicated on each Statement (net of Direct Payments made on behalf of Supplier) no later than five (5) business days after delivery of each Statement.

(d)     Accuracy of Statements.  The acceptance of the Statements or the Payments made hereunder shall not preclude Purchaser from questioning the correctness thereof at any time.  In the event that any inconsistencies or mistakes in such Statements or Payments are discovered or any excess or duplicate Payments are made by Purchaser, the Parties shall promptly rectify the mistake, and the appropriate Payment shall be made by or reimbursed to Purchaser.

(e)     Delivery of Statements and Payments.  Purchaser shall, unless otherwise directed in writing by Supplier or in connection with Direct Payments, send all Payments to:

Bank:                        TransPecos Banks
                             115 West 3rd
                             Contact: Rosario Villanueva
                             Phone: 432.445.9000
                             ABA: 112-320-788


Account Name:                TransPecos Foods, LP
                             2 Spencer Road
                             Boerne, Texas 78006
                             Account Number: 0463809


7.     Product Quality.

(a)     Quality Control.  Supplier understands and agrees that it is an essential condition of this Agreement to protect the high reputation enjoyed by Purchaser, and that the Products shall be of high and consistent quality, style and appearance and subject to the approval and continuing supervision and control of Purchaser.  The Products shall be manufactured, packaged, stored and shipped in compliance with all applicable federal, state and local laws,

6

regulations, ordinances and industry standards (or Purchaser's standards to the extent they exceed industry standards) for the Products and in strict compliance with this Agreement.

(b) <u>Testing; Approval of Sample Products</u>. Supplier shall follow industry standard procedures for testing the Products for compliance with laws, regulations, standards and procedures, and shall permit Purchaser (upon reasonable notice) to inspect its testing, manufacturing and quality control records, procedures and facility and to test or sample the Products for compliance with this <u>Section 7</u> and the other terms and conditions of this Agreement. Products found by Purchaser at any time not to comply with applicable laws, regulations, standards and procedures shall be deemed unapproved, even if previously approved by Purchaser, and shall not be purchased hereunder (and Purchaser shall have no responsibility for payment of the production of such Products) until Supplier can demonstrate to Purchaser's satisfaction that the Products have been brought into full compliance.

(c) <u>Facility</u>. Supplier's facility will be open to inspection by Purchaser upon reasonable prior written notice. Supplier will deliver to Purchaser all standard facility inspection reports and/or certificates required by any federal, state or local agency for those facilities involved in the production of the Products upon reasonable request.

8. <u>No Joint Venture</u>. Nothing herein contained shall be construed to place the Parties in the relationship of partners, joint venturers, or agents, and neither Party shall have the power to obligate or bind the other Party in any manner whatsoever.

9. <u>Product Compliance with Laws and Specifications</u>.

(a) Supplier represents, warrants and covenants that it will comply with all applicable federal, state, and local laws, rules, and regulations regarding its performance under this Agreement and the provision of the Manufacturing Operations, including the production of the Products, including but not limited to, any laws related to payment of employee-related taxes, such as social security, FICA, and workers' compensation and wage and hour laws. Supplier shall not utilize any undocumented workers to perform any of its duties hereunder and shall keep on file during the term of this Agreement Forms I-9 and related documentation for all of its employees.

(b) Supplier will pack the Products in packaging specified by Purchaser. The Products are hereby warranted and guaranteed by Supplier, as of the date of shipment or delivery, (i) not to be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act (the "<u>FFDC Act</u>"), as amended, or within the meaning of applicable federal or state laws or municipal ordinances in which the definitions of adulteration are substantially the same as those contained in the FFDC Act; (ii) not to be Products which may not, under the provisions of section 405 or 505 of the FFDC Act, be introduced into interstate commerce; and (iii) comply in all respects with the pure food and drug laws of all states, including but not limited to California's Health and Safety Code, Section 25249.5 et seq., as amended (commonly known as "<u>Proposition 65</u>"); the Federal Hazardous Substance Act; the Federal Insecticide; Fungicide and Rodenticide Act; and the Nutrition Labeling and Education Act. The Products comprising each shipment or delivery hereafter made by Supplier to Purchaser are hereby guaranteed, as of the date of such shipment or delivery, not to be misbranded.

7

10.     Indemnification.

(a)     Indemnification by Supplier. Supplier is solely responsible for, and will defend, indemnify and hold harmless each Purchaser Indemnified Party from, any and all losses, costs, expenses (including reasonable attorney's fees) claims, demands, liabilities, causes of action or damages, arising out of:

(i)     alleged defects or deficiencies in the Products or the use thereof (including but not limited to product liability claims), or fraud, misrepresentation or other claims related to the Products (other than those arising from the negligence, gross negligence or intentional misconduct of a Purchaser Indemnified Party, or the condition of the Materials at the time of delivery to Supplier);

(ii)    Supplier or its Affiliates' activities relating to the manufacturing of the Products as contemplated hereby; or

(iii)   any breach by Supplier of this Agreement.

(b)     Indemnification by Purchaser. Purchaser is solely responsible for, and will defend, indemnify and hold harmless each Supplier Indemnified Party from any and all losses, costs, expenses (including reasonable attorney's fees) claims, demands, liabilities, causes of action or damages, arising out of:

(i)     alleged defects or deficiencies in the Products or the use thereof (including but not limited to product liability claims), or fraud, misrepresentation or other claims related to the Products in each case arising from the negligence, gross negligence or intentional misconduct of a Purchaser Indemnified Party); or

(ii)    any breach by Purchaser of this Agreement.

(c)     Survival. The indemnifications under this Section 10 shall survive the termination of this Agreement for a period of two (2) years after the last provision of Products by Supplier under this Agreement.

11.     Termination.

(a)     Purchaser Termination Rights. Purchaser may terminate this Agreement for any reason or no reason upon the giving of ten (10) days' prior written notice to Supplier; provided, however, that this Agreement may not be terminated by Purchaser prior to the expiration of sixty (60) days from the Effective Date of this Agreement. For the sake of clarity, Purchaser shall be obligated to pay, at a minimum, the cost of all compensation due to the Retained Employees, as described in Section 2(g)(i) herein, for a period of not less than sixty (60) days from the Effective Date.

(b)     Supplier Termination Rights. Supplier shall have the right to terminate this Agreement if Purchaser materially breaches its obligations under this Agreement and fails to

8

cure the default within ten (10) days from receipt of written notice from Supplier describing in reasonable detail such default.

12.     Supplier and Purchaser Representations and Covenants.

(a)     Authority of Supplier. Supplier agrees and represents that Supplier has the authority to execute, deliver and perform its obligations under this Agreement, and is validly existing and in good standing under the laws of the state of its formation.

(b)     Authority of Purchaser. Purchaser represents and warrants that Purchaser has the authority to execute, deliver and perform its obligations under this Agreement, and is validly existing and in good standing under the laws of the state of its formation.

(c)     Insurance. Supplier shall maintain (and shall cause each of its agents, independent contractors and subcontractors performing any services hereunder to maintain) at all times commercial general liability insurance including but not limited to (i) injury to person; (ii) damage to property; (iii) contractual liability coverage; (iv) personal and advertising injury liability; (v) products liability coverage including a broad form vendor's endorsement (additional insured-vendor), in an amount not less than Five Million Dollars ($5,000,000) for each occurrence listing Purchaser, and its licensors, licensees, affiliates and wholly-owned subsidiaries as additional insureds. Such insurance coverage shall constitute minimum requirements and Supplier may at its discretion carry greater or broader insurance. Such insurance shall be issued by companies licensed to do business in the state(s) where services are rendered and shall be subject to the approval of Purchaser, in its reasonable discretion. Upon execution of this Agreement and prior to commencement of this Agreement, Supplier shall provide Purchaser with a certificate of insurance, which shall indicate all insurance coverage required by this Section 12(c) and that Purchaser will be provided with thirty (30) days' written notice by such insurance companies prior to any material modification or cancellation of such policy.

13.     Effect of Termination.

(a)     Payments. Upon the termination of this Agreement, the entire unpaid balance of all Payments owing and due under Section 6(b) of this Agreement shall immediately become due and payable and shall be paid within thirty days (30) days following the end of the Term.

(b)     Inventory. After termination of this Agreement, Supplier shall have no further right to manufacture the Products. Upon termination of this Agreement, Supplier shall transfer and deliver to Purchaser all Products which were produced in accordance with the terms of this Agreement or supplied by Purchaser to be used or consumed in Manufacturing Operations at Purchaser's sole cost and expense.

14.     Confidentiality.

(a)     In furtherance of a mutually advantageous business relationship, the Parties may, during the term of this Agreement, disclose to each other certain proprietary and confidential information relating to their respective products and businesses (the "Confidential

9

Information"). Confidential Information includes, but is not limited to, ingredients, formulae, compositions, mixtures, recipes, compilations, marketing and business plans, designs, documentation, memoranda, customer lists, pricing policies, operational methods, trade secrets, systems, processes and procedures, the terms of this Agreement, and all other information, whether in written, oral, encoded, electronic or other tangible or intangible form, and whether or not labeled, marked or otherwise identified as "Confidential" upon disclosure thereof, relating to the Products and the Parties' respective services and businesses, but Confidential Information shall not include information that (i) is or becomes publicly known and such public knowledge or disclosure is not the result of any act or failure to act on the part of the Party to which the Confidential Information is disclosed or any employee, officer, director, agent, advisor or contractor of such Party, (ii) is, at the time of disclosure, already known to the Party to which the Confidential Information is disclosed, provided that such Party can demonstrate that such Confidential Information was known to and lawfully obtained by or learned by such Party prior to the time of disclosure, (iii) is information that can be shown by written documentation to have been independently developed by the Party to which the Confidential Information is disclosed, without utilizing the Confidential Information, or (iv) is information disclosed by a third party to the Party to which the Confidential Information is disclosed provided that such third party is not under a duty to keep such disclosed information confidential.

(b)     Each Party agrees that:

(i)     Any Confidential Information disclosed in furtherance of this Agreement will remain the sole property of the disclosing Party; and

(ii)     The receiving Party will hold such Confidential Information in strict confidence by using the same degree of care, but in no event less than a reasonable standard of care, as such Party uses with respect to its information of like importance, and shall use such Confidential Information solely in its performance under the terms of this Agreement. The receiving Party will not disclose such Confidential Information to any Person other than the receiving Party's officers, directors, owners, employees, agents and representatives to whom such disclosure is required for the purposes of this Agreement and then only to Persons who have been advised of this Agreement and the receiving Party's obligations under this Section 14. The receiving Party shall be responsible for a breach of this Section 14 by any such officers, directors, owners, employees, agents or representatives of the receiving Party.

(c)     In the event that a receiving Party is requested pursuant to, or required by, applicable law, regulation or legal process to disclose any Confidential Information of the disclosing Party, the receiving Party shall (i) immediately notify the disclosing Party in writing of the request or requirement so that the disclosing Party may seek a protective order or other appropriate remedy or the disclosing Party, in its sole discretion, may waive compliance with the terms of this Agreement, and (ii) consult with the disclosing Party regarding the advisability of taking legally available steps to resist or narrow the request or requirement. If a protective order or other remedy is not obtained and the disclosing Party does not waive compliance with the terms of this Agreement, the receiving Party agrees to (A) furnish only that portion of the Confidential Information that the receiving Party is advised by written opinion of counsel is

10

legally required, (B) exercise reasonable efforts to obtain assurance that confidential treatment will be accorded the Confidential Information, and (C) provide the disclosing Party with written notice of the Confidential Information to be disclosed as far in advance of disclosure as is practicable.

(d)     Any trade secrets included in the Confidential Information will also be entitled to all of the protections and benefits under applicable trade secret law.  Nothing contained in this Section 14 shall be deemed to limit any proprietary rights Purchaser may have in or to any trade secrets or other rights in connection with the Products under applicable law.

(e)     The Parties agree that a breach of this Section 14 by the other Party or its affiliates, representatives or employees would cause irreparable damage and harm that could not be compensated for by monetary damages.  Accordingly, in the event of the breach or imminently threatened breach of this Section 14 by either Party, the other Party, in addition to and not in limitation of its right to receive monetary damages or pursue other rights and remedies available under this Agreement or at law or in equity, shall be entitled to injunctive relief from a court of competent jurisdiction, without requirement of posting of bond or other surety or showing actual damages.

15.     Survival of Rights.

(a)     Statements and Payments.  The terms and conditions of this Agreement requiring Supplier to furnish Purchaser with reports, Statements or accounts, and providing Purchaser with the right to examine and make copies of Supplier books and records to determine or verify the correctness and accuracy of Supplier's reports, Statements or accounts as they relate to the Products shall survive the termination of this Agreement for twelve (12) months.

(b)     Other Activities.  The terms and conditions of this Agreement providing for any activity following the effective date of termination of this Agreement shall survive until such time as those terms and conditions have been fulfilled or satisfied.

16.     Intellectual Property.

(a)     Supplier acknowledges and agrees that all services performed and work and intellectual property arising out of or created under this Agreement, including without limitation, any recipes, formulas, ingredients or combinations thereof, and any other proprietary information created solely in connection with the Products developed or provided under this Agreement, whether created by Supplier, or jointly by Supplier and Purchaser, are the sole and exclusive property of Purchaser and are "works made for hire."  Supplier hereby irrevocably assigns, transfers and sets over absolutely to Purchaser all of its rights, title and interest (whether now in existence or hereafter arising) in and to any such work and proprietary information created, developed or conceived solely in connection with the Products developed or provided under this Agreement by Supplier during the term of this Agreement and any intellectual property and proprietary rights related thereto.

(b)     Purchaser retains all rights, title and interest in and to the Products and all intellectual property and proprietary rights throughout the world therein, including, but not limited to, the label, design, trademark, trade name, and trade secret rights.  All art, plates,

negatives or designs prepared by Purchaser or for Purchaser by either Supplier or Purchaser/Supplier's printer, lithographer, or bag, box or carton manufacturer shall be the exclusive property of Purchaser and shall remain Purchaser property upon termination of this Agreement by either party. All Products manufactured, labeled, sold, and/or shipped by Supplier shall contain a proprietary rights legend and other notices in the form and substance specified by Purchaser in writing from time to time. Supplier shall not have and shall not claim any intellectual property or proprietary rights in the Products manufactured, labeled, sold, and/or shipped by Supplier pursuant to this Agreement. Supplier shall execute all documentation or other reasonable instruments deemed necessary by Purchaser to secure and enforce Purchaser's rights therein.

17. Notices. Unless otherwise specified herein, all notices, requests, demands, payments, consents and other communications hereunder shall be transmitted in writing and shall be deemed to have been duly given (i) when hand delivered, (ii) upon delivery when sent by express mail, courier, overnight mail or other overnight or next day delivery service, (iii) when received when sent by facsimile provided that a copy thereof is contemporaneously delivered pursuant to Section 17(i), (ii) or (iv) hereof, or (iv) three (3) days after the date mailed when sent by registered or certified United States mail, postage prepaid, return receipt requested, or when deposited with a public telegraph company for immediate transmittal, charges prepaid, addressed as follows:

    (a)    If to Supplier:

        TransPecos Foods, LP
        2 Spencer Road
        Boerne, Texas 78006
        Attention: Gary Candy
        Facsimile: (830) 248-8231

        with a copy to:

        Kennedy, Toppin & Sutherland, LLP
        112 East Pecan Street, Suite 800
        San Antonio, Texas 78205
        Attention: Bruce E. Toppin, III
        Facsimile: (210) 228-0781

    (b)    If to Purchaser:

        _____
        _____
        _____
        Attention: _____
        Facsimile: _____

        with a copy to:

_____
_____
_____
Attention: _____
Facsimile: _____

Purchaser or Supplier may change its address by giving written notice of such change of address to the others.

18.    <u>Conformity to Law</u>. Supplier undertakes and agrees to obtain and maintain, at Purchaser's expense, all Operating Permits.

19.    <u>Severability</u>. The determination that any provision of this Agreement is invalid or unenforceable shall not invalidate this Agreement, and the remainder of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

20.    <u>Assignment</u>. Neither this Agreement nor any of Supplier's rights shall be sold, transferred or assigned by Supplier without Purchaser's prior written approval, and no rights shall devolve by operation of law or otherwise upon any assignee, receiver, liquidator, trustee or other party. Supplier acknowledges and agrees that (i) a transfer by operation of law or otherwise of Supplier's interest in this Agreement and (ii) a change of control affecting Supplier, and involving a Person that in the reasonable opinion of Purchaser is a competitor of Purchaser, shall be deemed to constitute an assignment by Supplier of Supplier's rights, duties and obligations hereunder. This Agreement shall be binding upon any approved assignee or successor of Supplier and shall inure to the benefit of Purchaser, its successors and assigns. Purchaser may assign this Agreement and any of its rights hereunder to any Affiliate or third party with whom it desires to enter into a co-packing relationship upon written notice to Supplier, or to any third party pursuant to or in connection with an order of the Bankruptcy Court.

21.    <u>No Waiver, Modification, Etc</u>. This Agreement, including exhibits, schedules and appendices, constitutes the entire agreement and understanding between the Parties and cancels, terminates, and supersedes any prior agreement or understanding relating to the subject matter hereof between Supplier and Purchaser. There are no representations, promises, agreements, warranties, covenants or understandings other than those contained herein. None of the provisions of this Agreement may be waived or modified, except expressly in writing signed by both Parties. However, failure of either party to require the performance of any term in this Agreement or the waiver by either party of any breach shall not prevent subsequent enforcement of such term nor be deemed a waiver of any subsequent breach.

22.    <u>Miscellaneous</u>.

(a)    When necessary for appropriate meaning, a plural shall be deemed to be the singular and singular shall be deemed to be the plural. The attached schedules and exhibits are an integral part of this Agreement. Section headings are for convenience only and shall not add to or detract from any of the terms or provisions of this Agreement. This Agreement shall be construed in accordance with the laws of the state of Texas.

13

(b)     This Agreement was negotiated among the Parties, each of whom had the opportunity to consult with legal counsel during the negotiations, drafting, and execution of this Agreement, and the Parties agree that this Agreement shall not be construed against any Party as the drafter.

23.     <u>Submission to Jurisdiction</u>.     Unless and to the extent otherwise specifically provided herein, the parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith or any of the transactions contemplated hereby or thereby. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceedings may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute or proceeding brought in such courts or any defense of inconvenient forum in connection therewith.

*[Signature page follows immediately]*

14

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the Effective Date by their respective officers thereunto duly authorized.

Supplier:

**TRANSPECOS FOODS, LP**

By:     TPF GP, LLC, its General Partner

By:

_____

Gary Candy, Manager

Purchaser:

_____

By:     _____

Name:   _____

Title:  _____

SLC_863208.13

## SCHEDULE 2(a)

## PRODUCTS

See attached.

| BRAND | Item | Product Description |
|---|---|---|
| Ahold | 223677 | 12/9 oz Breaded Onion Petals – Ahold |
| Ahold | 320877 | 12/8oz Ovenable Breaded Mozz Sticks – Ahold |
| ALDI | 233053 | 12/32oz Battered Sweet Corn Nuggets |
| ALDI | 372353 | 12/8oz Ovenable Jalapeno Cheddar and Chipotle Combo |
| ALDI | 400153 | Appetitos Multi Pack |
| American Sunshine | 227276 | 12/20oz American Sunshine Preformed Onion Ring |
| Best Choice | 222543 | 12/20oz Best Choice Preformed Onion Rings |
| Best Choice | 320843 | 12/8oz Ovenable Breaded Mozz Sticks - Best Choice |
| Best Choice | 371943 | 12/8oz Oven Breaded Cheddar Cheese Jalapeno - Best Choice |
| Best Choice | 372243 | 6/32oz Oven Breaded Cheddar Cheese Jalapeno - Best Choice |
| Best Choice | 700143 | 12/8oz Best Choice Spinach & Artichoke Dip |
| Best Choice | 220843 | 12/16oz 3/8" Gourmet Parfried Natural Sliced Onion Ring – Best Choice |
| Best Choice | 230343 | 6/32oz Battered Sweet Corn Nuggets – Best Choice |
| Best Choice | 321643 | 6/32oz Ovenable Breaded Mozz Sticks – Best Choice |
| Best Choice | 371843 | 12/8oz Oven Breaded Cream Cheese Jalapeno - Best Choice |
| Best Choice | 630043 | 12/8oz Best Choice Potato Skins |
| Best Yet | 227662 | 12/16oz Gourmet Parfried Thick Cut Natural Sliced Onion Ring - Best Yet |
| Best Yet | 371862 | 12/8oz Best Yet Jalapeno & Cream Cheese Peppers |
| Best Yet | 371962 | 12/8oz Oven Breaded Cheddar Cheese Jalapeno - Best Yet |
| Best Yet | 320862 | 12/8oz Ovenable Breaded Mozz Sticks – Best Yet |
| Better Valu | 223154 | 12/16oz Battered Preformed Onion Ring – Better Valu |
| Caribou | 223144 | 12/16oz Battered Preformed Onion Ring – Caribou |
| Certi Fresh | 350170 | 6 / 2# Breaded Jalapeno Cheddar Poppers – CF |
| Certi Fresh | 350270 | 6 / 2# Breaded Cream Cheese Jalapeno - CF |
| DQ | 310103 | Raw Breaded Mozz Stick Round |
| DQ | 210103 | 4 / 5# 3/8" Natural Gourmet Thin Cut Onion Ring – DQ |
| Food Club | 223661 | 12/9oz Breaded Onion Petals – Food Club |
| Food Club | 320861 | 12/8oz Ovenable Breaded Mozz Sticks – Food Club |
| Food Club | 321561 | 6/30oz Ovenable Breaded Mozz Stick – Food Club |
| Food Club | 370761 | 12/8oz Oven Breaded Chipotle Cream Cheese Jalapeno – Food Club |
| Food Club | 700161 | 12/8oz Food Club Spinach & Artichoke Dip |
| Food Club | 371861 | 12/8oz Oven Breaded Cream Cheese Jalapeno - Food Club |
| Food Club | 371961 | 12/8oz Breaded Ovenable Cheddar Cheese Jal |

| Food Club | 630061 | 12/8oz Food Club Potato Skins |
| Food Club | 227261 | 12/16oz Breaded Preformed Onion Ring - Food Club |
| Food Club | 234061 | 12/8oz Ovenable Breaded Mushrooms - Food Club |
| Food Club | 610061 | 12/10oz Food Club Buffalo Wings |
| Food Club | 620061 | 12/10oz Food Club Honey BBQ Wings |
| Fred Meyer | 371872 | 8/18oz Breaded Oven Cream Cheese Jal - Fred Meyer |
| Giant Eagle | 320840 | 12/8oz Ovenable Breaded Mozz Sticks - Giant Eagle |
| Giant Eagle | 371940 | 12/8ot Oven Breaded Cheddar Cheese Jalapeno - Giant Eagle |
| Giant Eagle | 234040 | 12/8oz Ovenable Breaded Mushrooms - Giant Eagle |
| Giant Eagle | 233040 | 12/8oz Battered Sweet Corn Nuggets - Giant Eagle |
| Giant Eagle | 371840 | 12/8oz Oven Breaded Cream Cheese Jalapeno - Giant Eagle |
| HCF | 371726 | 12/5.5 oz Cream Cheese Jalapeno Bites - HCF |
| HCF | 371626 | 12/5.5 oz Cheddar Jal Bites - HCF |
| HCF | 320926 | 12/5.5 oz Breaded Mozz Stick - HCF |
| HCF | 230726 | 12/5.5 oz Breaded Mushroom Bites - HCF |
| HEB | 321626 | 6/32 oz Ovenable Breaded Mozz Sticks - HEB |
| HEB | 370726 | 12/8oz Oven Breaded Chipotle Cream Cheese Jalapeno - HEB |
| HEB | 320826 | 12/8oz Ovenable Breaded Mozz Sticks - HEB |
| HEB | 371826 | 12/8oz Oven Breaded Cream Cheese Jalapeno - HEB |
| HEB | 230326 | 6/32 oz Battered Sweet Corn Nuggets - HEB |
| HyTop | 227645 | 12/16 oz 3/8" Gourmet Parfied Natural Sliced Onion Rings |
| HyTop | 230345 | 12/32oz Battered Sweet Corn Nuggets - Hy-Top |
| HyTop | 233645 | 12/26oz Hy-Top Broccoli & Cheese Nuggets |
| HyVee | 320822 | 12/8oz Ovenable Breaded Mozz Sticks - Hy-Vee |
| HyVee | 371922 | 12/8oz Oven Breaded Cheddar Cheese Jalapeno - Hy-Vee |
| HyVee | 370722 | 12/8oz Oven Breaded Chipotle Cream Cheese Jalapeno - Hy-Vee |
| HyVee | 371822 | 12/8oz Oven Breaded Cream Cheese Jalapeno - Hy-Vee |
| Kroger | 370770 | 8/18oz Oven Breaded Chipotle Cr Ch Jal - Kroger |
| Kroger | 371870 | 8/18oz Breaded Oven Cream Cheese Jalapeno Kroger |
| Lake Erie | 210511 | 8 / 2# 3/4" Gourmet Breaded Thick Cut Crumb Onion Ring - Lake Erie |
| Lake Erie | 220211 | 4 / 2.5# 5/8" Beer Battered Thick Cut Onion Ring - Lake Erie |
| Lake Erie | 221111 | 4 / 2.5# 5/16" Battered Thin Cut Onion Ring - Lake Erie |
| Lake Erie | 221411 | 4 / 2.5# 1/2" Battered Thick Cut Onion Ring - Lake Erie |
| LAMB | 210675 | 4/3.5#, 1 1/4" Natural Gourmet Onion Rings - Tantalizer |

| LAMB | 210775 | 4/5# 3/8" Natural Gourmet Onion Rings - Tantilizer #30482 |
| LAMB | 210275 | 8/2# 3/8" Natural Gourmet Onion Ring - Tantilizer # 30412 |
| LAMB | 210475 | 8/2# 3/4" Natural Gourmet Onion Ring - Tantilizer # 30411 |
| Master Choice | 320825 | 12/8oz Ovenable Breaded Mozz Sticks - Master Choice |
| Master Choice | 371925 | 12/8oz Oven Breaded Cheddar Cheese Jalapeno- Master Choice |
| Miami Subs | 220265 | 4 / 2.5# 5/8" Beer Battered Thick Cut Onion Ring - Miami Subs |
| Morning Fresh | 320869 | 12/8oz Ovenable Breaded Mozz Stick |
| Morning Fresh | 371969 | 12/8oz Oven Breaded Cheddar Cheese Jalapeno - Morning Fresh Farms |
| Morning Fresh | 371869 | 12/8oz Oven Breaded Cream Cheese Jalapeno - Morning Fresh Farms |
| PVF | 331436 | 12/32oz Battered Apple Nuggets - PVF |
| PVF | 230336 | 12/32 oz Battered Sweet Corn Nuggets - PVF |
| Ralph's | 371871 | 8/18oz Breaded Oven Cream Cheese Jal - Ralph's |
| Shurfine | 320860 | 12/9oz Ovenable Breaded Mozz Sticks - Shurfine |
| Shurfine | 700160 | 12/8oz Shurfine Spinach & Artichoke Dip |
| Shurfine | 371860 | 12/8oz Oven Breaded Cream Cheese Jalapeno - Shurfine |
| Shurfine | 371960 | 12/8 oz Oven Breaded Cheddar Cheese Jalapeno - Shurfine |
| Shurfine | 227260 | 12/16oz Breaded Preformed Onion Ring - Shurfine |
| Shurfine | 610060 | 12/10oz Shurfine Buffalo Wings |
| Shurfine | 620060 | 12/10oz Shurfine Honey BBQ Wings |
| Shurfine | 630060 | 12/8oz Shurfine Potato Skins |
| Southern Home | 223665 | 12/9oz Breaded Onion Petals - Southern Home |
| Southern Home | 371965 | 12/8oz Ovenable Cheddar Cheese Jal |
| Southern Home | 371865 | 12/8oz Oven Breaded Cream Cheese Jalapeno - Southern Home |
| Southern Home | 321565 | 6/30oz Ovenable Breaded Mozz Stick - Southern Home |
| Southern Home | 320865 | 12/8oz Ovenable Breaded Mozz Sticks - Southern Home |
| Southern Home | 370765 | 12/8oz Oven Breaded Chipotle Cream Cheese Jalapeno - Southern Home |
| Southern Home | 227265 | 12/20oz Southern Homes Preformed Onion Ring |
| Southern Home | 227665 | 12/20 oz Southern Homes Gourmet Natural Sliced Onion Ring |
| Southern Home | 234065 | 12/24oz Southern Homes Breaded Mushrooms |
| Southern Home | 610065 | 12/10oz Southern Homes Buffalo Wings |
| Southern Home | 620065 | 12/10oz Southern Homes Honey BBQ Wings |
| Southern Home | 700165 | 12/8oz Southern Home Spinach & Artichoke Dip |
| TPF | 210101 | 4 / 5# 3/8" Natural Gourmet Thin Cut Onion Ring - TPF |
| TPF | 220101 | 4 / 2.5# Beer Battered Onion Rings 3/8" |

| TPF | 221101 | 4 / 2.5# 5/16" Battered Thin Cut Onion Ring - TPF |
| TPF | 230101 | 6 / 2# Battered Okra - TPF |
| TPF | 321101 | 4 / 3# Battered Square Mozz Sticks - TPF |
| TPF | 320101 | 6 / 2# Battered Mozzarella Cheese Sticks |
| TPF | 310101 | 6 / 2# Raw Breaded Mozz Stick Round - TPF |
| TPF | 220201 | 4 / 2.5# 5/8" Beer Battered Thick Cut Onion Ring - TPF |
| TPF | 230601 | 6 / 2# Breaded Mushrooms - TPF |
| TPF | 222701 | 6 / 2# Battered Texas Tanglers - TPF |
| TPF | 350101 | 6 / 2# Breaded Cheddar Jalapeno Poppers - TPF |
| TPF | 230401 | 6 / 2# Battered Mushrooms - TPF |
| TPF | 222501 | 8 / 2# Breaded Preformed Onion Ring - TPF |
| TPF | 210501 | 8 / 2# 3/4" Gourmet TBreaded Thick Cut Crumb Onion Ring - TPF |
| TPF | 350201 | 6 / 2# Breaded Cream Cheese Jalapeno Peppers - TPF |
| TPF | 221401 | 4 / 2.5# 1/2" Battered Thick Cut Onion Ring - TPF |
| TPF | 211101 | 8 / 2.5# 3/8" Homestyle Breaded Thin Cut Onion Ring - TPF |
| TPF | 210001 | 6 / 2.5# 3/8" Gourmet Breaded Thin Cut Onion Ring - TPF |
| TPF | 230301 | 6 / 2# Battered Sweet Corn Nuggets - TPF |
| Whataburger | 227834 | 8 / 2.5# Whataburger Battered Onion Ring - WB |

## SCHEDULE 2(g)(i)

## SUPPLIER'S EMPLOYEE SALARIES OR HOURLY WAGES AS OF THE DATE HEREOF AND INSURANCE BENEFIT SUMMARY

See attached.

## SCHEDULE 2(g)(i)

## SUPPLIER'S EMPLOYEE SALARIES OR HOURLY WAGES AS OF THE DATE HEREOF AND INSURANCE BENEFIT SUMMARY

See attached.

**Employee Payroll Information**

| No. | Name | 2 Weeks' Salary | Hourly Rate |
|---|---|---|---|
| 562 | RUVALCABA, MARIA | N/A | $ 8.50 |
| 1079 | RICO, EMILIO | N/A | $ 7.25 |
| 94 | GARCIA, ASUSENA | N/A | $ 11.00 |
| 61 | NATIVIDAD, MARCELINO | N/A | $ 11.00 |
| 191 | RAMIREZ, ROSA | N/A | $ 8.00 |
| 253 | SALCIDO, GARY | N/A | $ 15.25 |
| 99 | GUTIERREZ, MARIA | N/A | $ 13.00 |
| 663 | BARRAZA, ELODIA | N/A | $ 8.00 |
| 1184 | ESTRADA, RICARDO | N/A | $ 8.50 |
| 186 | RIVERA, BERTHA | N/A | $ 8.00 |
| 1130 | VARELA, MICHAEL | N/A | $ 9.00 |
| 1213 | BAILEY, GABE | N/A | $ 7.75 |
| 573 | FIERRO, DULCES | N/A | $ 8.50 |
| 1151 | RENTERIA, GRAVIELA | N/A | $ 7.50 |
| 1266 | MENDIAZ, MARIA | N/A | $ 7.50 |
| 1248 | GALINDO, RUBEN | N/A | $ 8.00 |
| 1311 | SOLIS, CARMEN | N/A | $ 8.00 |
| 225 | ORTEGA, WENSESLADA | N/A | $ 8.00 |
| 176 | ORTIZ, RAMON | N/A | $ 9.55 |
| 327 | HERNANDEZ, OSCAR F. | N/A | $ 9.00 |
| 132 | GARCIA, ROMELIA | N/A | $ 9.00 |
| 189 | SERNA, MARIA | N/A | $ 9.00 |
| 112 | VENEGAS, DORA | N/A | $ 8.60 |
| 361 | VILLEGAS, MARIA D. | N/A | $ 8.00 |
| 109 | RODRIGUEZ, IMELDA | N/A | $ 9.25 |
| 232 | CARRASCO, VERONICA | N/A | $ 9.05 |
| 161 | VENEGAS, DELMA | N/A | $ 8.50 |
| 47 | RODRIGUEZ, MARIA DEL ROSARIO | N/A | $ 9.00 |
| 115 | VILLESCAS, CLAUDIA | N/A | $ 9.05 |
| 224 | ANCHONDO, IMELDA | N/A | $ 9.25 |

| | | | |
|---|---|---|---|
| 1300 | CONTRERAS, CONNIE | N/A | $ 8.25 |
| 502 | RAMIREZ, ESTEBAN | N/A | $ 7.25 |
| 142 | MEDRANO, RAMON | N/A | $ 10.00 |
| 39 | BARRAZA, JULIA | N/A | $ 8.50 |
| 497 | CARRASCO, LORENZO | N/A | $ 7.25 |
| 1246 | FUENTEZ, DANIEL | N/A | $ 9.00 |
| 767 | NAVARRETTE, MARGIE | N/A | $ 8.15 |
| 731 | SOTELO III, MANUEL | N/A | $ 17.50 |
| 387 | RODRIGUEZ, VERONICA ANN | N/A | $ 7.25 |
| 794 | RODRIGUEZ, JACOB O. | N/A | $ 7.25 |
| 103 | MUNOZ, ARTEMIO | N/A | $ 17.50 |
| 138 | VASQUEZ, JUAN | N/A | $ 15.00 |
| 209 | ESTRADA, CECILIA | N/A | $ 12.00 |
| 1123 | SIMIK, JAMES SCOTT | $ 1,923.04 | $ - |
| 155 | VILLEGAS, BERTHA OLGA | N/A | $ 10.25 |
| 65 | NATIVIDAD, ISRAEL | N/A | $ 15.00 |
| 433 | BRIONES, PABLO | N/A | $ 10.00 |
| 42 | FUENTES, MARINA | N/A | $ 12.00 |
| 548 | ORTIZ, JIMMY | N/A | $ 8.50 |
| 322 | HERNANDEZ, OSCAR | N/A | $ 20.00 |
| 34 | SALCIDO, SHERYL | N/A | $ 9.50 |
| 67 | CAMPOS, FRANCES | N/A | $ 9.75 |
| 74 | RONQUILLO, CARLOS R. | N/A | $ 20.25 |
| 13 | MELENDEZ JR., DAVID | N/A | $ 22.00 |
| 685 | TERRY, WINDELL | N/A | $ 17.00 |
| 1346 | MACIAS, ERNESTO | $ 2,115.38 | $ - |
| 1305 | MARTINEZ, GARRICK | N/A | $ 7.25 |

| | | | |
|---|---|---|---|
| 381 | CHAVEZ, SUNNY I. | N/A | $ 9.00 |
| 279 | RODRIGUEZ, ALBERTO | N/A | $ 7.25 |
| 102 | MENDOZA, MARICELA | N/A | $ 11.00 |
| | | | |
| | | | |
| 302 | BARRERA, YOLANDA | N/A | $ 9.00 |
| | | | |

**Insurance Benefits**

| Insurer | Premium |
|---|---|
| Blue Cross Blue Shield Health Insurance Montly Premium: | $ 2,395.75 |
| Cigna Life and AD&D Insurance Monthly Premium: | $ 420.45 |

## SCHEDULE 2(g)(iii)

## INSURANCE COVERAGE AND PAYMENTS

See attached.

# STANDARD FUNDING CORP.

335 Crossways Park Dr,
Woodbury, NY 11797
(516) 364-0200

## PREMIUM FINANCE AGREEMENT

ACCOUNT NO.

Please check one box:

☒ Commercial Lines   ☐ Personal Lines        Quote: 57224

| CASH PRICE (TOTAL PREMIUMS) | $ | 110,102.00 |
|---|---|---|
| CASH DOWN PAYMENT | $ | 16,515.30 |

**AGENT (Name and place of business)**
NORTEAN INSURANCE & RISK MGMT
P.O. BOX 795008
SAN ANTONIO, TX 78279 0000
PHONE 210 223-9171

**INSURED (Name and place of business)**
TRANSTEXAS FOODS, LP
112 E. PECAN ST, STE 800
SAN ANTONIO, TX 78205
SS or PID #
PHONE  210 228-4413

**DEFINITIONS:** STANDARD FUNDING CORP. will be herein after referred to as STANDARD. The words "the insured", "I", "your", "me", "my" mean the person borrowing the money to pay for the insurance policy(ies) listed on this PREMIUM FINANCE AGREEMENT.
**PROMISE TO PAY:** In consideration of the funds that are being advanced to pay my insurance on the policy(ies) listed below, I promise to make monthly payments as shown. I will make these payments until I have paid the full amount advanced for me, plus the finance charges and any other charges I may owe as shown on this agreement. I understand payments will be made to :
STANDARD FUNDING CORP., 335 Crossways Park Drive, Woodbury, NY 11797 and will be deemed made when actually received by STANDARD.

### TRUTH IN LENDING DISCLOSURES:

| AMOUNT FINANCED The amount of credit provided to you or on your behalf. | FINANCE CHARGE The dollar amount the credit will cost you. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. | ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. |
|---|---|---|---|
| $ 93,586.70 | $ 1,919.40 | $ 95,506.10 | 4.45 % |

| YOUR PAYMENT SCHEDULE WILL BE : | Number of Payments | Amount of Payments | When Payments are Due (Monthly/Quarterly/Annually): BEGINNING: |
|---|---|---|---|
| N | 10 | 9,550.61 | 08/25/10 |

**SECURITY:** I am giving STANDARD, its successors and/or assigns a security interest in all unearned premiums which may become payable under the financed insurance policies as well as any loss payments that arise the unearned premiums. I agree not to assign the policy(ies) except for the interest of mortgagees or loss payees, without written consent of STANDARD, its successors and/or assigns.
**DELINQUENCY CHARGES:** For installments which are in default for a period of 11 days or more, I agree to pay a delinquency charge of 5% of the delinquent installment. The acceptance by STANDARD of one or more late payments from me shall not prevent STANDARD or be construed as a waiver by STANDARD to exercise any or all of its rights hereunder in the event of any subsequent late payment made by me.
**PREPAYMENT:** I may prepay the full amount due on this agreement and receive a rebate of the finance charge in accordance with the rule of 78ths or such other method as authorized by law. Refunds of $3.00 or less will not be made.

**NOTE:** See both sides of this agreement for any additional information about non-payment, any required payment in full before the schedule date, and any prepayment refunds and penalties.
You have a right to receive at this time an itemization of the Amount Financed.  I do  ☒ do not  ☐ want an itemization.

| POLICY PREFIX AND NUMBER | EFFECTIVE DATE OF POLICY | SCHEDULE OF POLICIES (NAME OF INSURANCE COMPANY AND GENERAL AGENT) | COVG. TYPE | POLICY TERM | POLICY PREMIUM |
|---|---|---|---|---|---|
| CPO3981461 | 7/25/10 | ZURICH AMERICAN INSURANCE  * See Schedule Of Policies * | PKG  Fin Taxes / Fees  Ern Taxes / Fees | 12 | 103325.00 .00 .00 |
|  |  |  |  | TOTAL: | $ 110102.00 |

**ACCEPTANCE: I UNDERSTAND THAT THE BROKER OR AGENT WHOSE NAME APPEARS BELOW IS NOT A REPRESENTATIVE OF STANDARD AND HAS NO AUTHORITY TO PROMISE ANYTHING ON BEHALF OF STANDARD. I ALSO UNDERSTAND THAT STANDARD MAKES NO WARRANTIES OR REPRESENTATIONS CONCERNING THE FINANCED COVERAGE NOR HAS IT PLAYED ANY PART IN THE SELECTION, STRUCTURING OR ACQUISITION OF SUCH COVERAGE. The agreement shall not be valid until accepted by STANDARD. If my down payment is made by a check, I understand that it is accepted subject to collection and that if the check is dishonored, this agreement shall be deemed not to have been accepted, even if a notification of acceptance has been issued by STANDARD. The insured understands that STANDARD may transfer and/or assign this agreement to another duly licensed premium finance agency. State or Federal institution. The insured further acknowledges that upon satisfactory completion of this agreement, the un-designated Agent may receive a fee from Standard for the administration of this Agreement as is owned by applicable law.**

**NOTICE: I, DO NOT SIGN THIS AGREEMENT BEFORE YOU READ BOTH PAGES OF IT OR IF IT CONTAINS ANY BLANK SPACES 2. YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS AGREEMENT AT THE TIME YOU SIGN 3. UNDER THE LAW, YOU HAVE THE RIGHT TO PAY OFF IN ADVANCE THE FULL AMOUNT DUE AND UNDER CERTAIN CONDITIONS OBTAIN A PARTIAL REFUND OF THE FINANCE SERVICE CHARGE 4. KEEP YOUR COPY OF THIS AGREEMENT TO PROTECT YOUR LEGAL RIGHTS. THE INSURED, HAVE READ THIS AGREEMENT, I CLEARLY AND AGREE TO THE TERMS AND CONDITIONS ON BOTH PAGES (ALL INSUREDS DESIGNATED IN THE POLICY(IES) MUST SIGN, IF THE INSURED IS A CORPORATION, AN OFFICER MUST SIGN, ALSO, I ACKNOWLEDGE THE RECEIPT OF AN EXECUTED COPY OF THIS AGREEMENT AT THE TIME OF EXECUTION THEREOF AND REPRESENT I HAVE THE AUTHORITY TO SIGN ON BEHALF OF THE INSURED. BLANK SPACES (I hereby allow STANDARD to fill in these spaces which refer to the name of the insurer, the policy number(s) and the due date of the first installment if the insurance policy(ies) have not been issued at the time of my signing this agreement.**

| INSURED NAME | SIGNATURE OF THE INSURED OR AUTHORIZED REPRESENTATIVE | TITLE | DATE |
|---|---|---|---|

THE AGENT OR BROKER AGREES TO THE TERMS AND CONDITIONS ON BOTH PAGES OF THIS PREMIUM FINANCE AGREEMENT

| AGENT OR BROKER | SIGNATURE OF AGENT OR BROKER | TITLE | DATE |
|---|---|---|---|

SFC 11-09 (TX)                        PAGE 1 OF 2

# WORTHAM

*Insurance & Risk Management*
P.O. Box 795058 • San Antonio, Texas 78279
131 Interpark Blvd • 78216 • (210) 223-9171

## ———— INVOICE ————

TransPecos Foods, LP
112 E Pecan St #800
San Antonio, TX  78205

| | |
|---|---|
| **Invoice Date** | 07/27/10 |
| **Invoice No.** | 174367 |
| **Bill-To Code** | 22TRANSFOO |
| **Client Code** | 22TRANSFOO |
| **Inv Order No.** | 22#194064 |

Named insured: TransPecos Foods, LP

Please return this portion with your payment.

**Amount Remitted: $**

Make checks payable to: Wortham Insurance & Risk Mgt

| Effective Date | | Description | Transaction Amount |
|---|---|---|---|
| 07/25/10 | 07/25/10 to 07/25/11 | Zurich American Insurance Company Policy No. CPO398146107 *Renewal – Package Commercial | 103,325.00 |
| | | 10/11 Package Policy (Including Auto) | |
| | | Invoice Number: 174367      Amount Due: | 103,325.00 |

Premium Due and Payable on Effective Date in U.S. Dollars

# WORTHAM

*Insurance & Risk Management*

P.O. Box 795008 · San Antonio, Texas 78279
131 Interpark Blvd · 78216 · (210) 223-9171

## ━━━━━ I N V O I C E ━━━━━

TransPecos Foods, LP
112 E Pecan St #800
San Antonio, TX  78205

| | |
|---|---|
| Invoice Date | 07/27/10 |
| Invoice No. | 174368 |
| Bill-To Code | 22TRANSFOO |
| Client Code | 22TRANSFOO |
| Inv Order No. | 22#194065 |

Named Insured: TransPecos Foods, LP

Please return this portion with your payment.

**Amount Remitted: $**

Make checks payable to: Wortham Insurance & Risk Mgt

| Effective Date | Policy Period | Coverage Description | | Transaction Amount |
|---|---|---|---|---|
| 07/25/10 | 07/25/10 to 07/25/11 | American Guarantee and Liability Ins Co Policy No. ZA93762762 *Renewal - Umbrella Commercial | | 6,777.00 |
| | | 10/11 Umbrella Policy | | |
| | | Invoice Number: 174368 | Amount Due: | 6,777.00 |

**Premiums Due and Payable on Effective Date in U.S. Dollars**

22CMJ   Page: 1             ORIGINAL INVOICE

# ACORD CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
1/26/2011

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER Wortham Insurance & Risk Management | CONTACT NAME: | | |
|---|---|---|---|
| P.O. Box 795008 | PHONE (A/C, No, Ext): 210-223-9171 | | FAX (A/C, No): 210-223-2808 |
| San Antonio, TX 78279 | E-MAIL ADDRESS: | | |
| | **INSURER(S) AFFORDING COVERAGE** | | NAIC # |
| www.worthamsa.com | INSURER A: Zurich American Insurance Company | | |
| INSURED TransPecos Foods, LP | INSURER B: American Guarantee and Liability Ins. Co. | | |
| 112 E Pecan St., Suite 600 | INSURER C: | | |
| San Antonio, TX 78205 | INSURER D: | | |
| | INSURER E: | | |
| | INSURER F: | | |

## COVERAGES      CERTIFICATE NUMBER: 8400380      REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY | ✓ | | CPO398146107 | 7/25/2010 | 7/25/2011 | EACH OCCURRENCE | $ 1,000,000 |
| | ✓ COMMERCIAL GENERAL LIABILITY | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | CLAIMS-MADE ✓ OCCUR | | | | | | MED EXP (Any one person) | $ 10,00 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | POLICY □ PRO-JECT ✓ LOC | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | ✓ | | CPO398146107 | 7/25/2010 | 7/25/2011 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ✓ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS □ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ✓ HIRED AUTOS ✓ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | | | | | | | | $ |
| B | ✓ UMBRELLA LIAB ✓ OCCUR | | | ZAB3762782 | 7/25/2010 | 7/25/2011 | EACH OCCURRENCE | $ 5,000,000 |
| | EXCESS LIAB □ CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | DED □ RETENTION $0 | | | | | | | $ |
| | | | | | | | | $ |
| | | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | | | | | □ WC STATU- TORY LIMITS □ OTH- ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

Re: Project ID #20598 - 200 E. Palmer Street, Pecos, TX
Additional Insureds to be added in regard to general liability (CG 20 26) and automobile liability as required by written contract
RDP-TransPecos Investment Fund, LLC, RDP 11, LLC, U.S. Bancorp Community Development Corporation

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| U.S. Bancorp Community Development Corporation Attn: Lauren Franz 1307 Washington Ave., Suite 300 St. Louis MO 63103 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE (SA) Charles Bigelow |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)      The ACORD name and logo are registered marks of ACORD

## CERTIFICATE ATTACHMENT

| DATE ISSUED |
|---|
| 1/26/2011 |

**NAMED INSURED:**
TransPecos Foods, LP
112 E Pecan St., Suite 800
San Antonio, TX 78205

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, WE WILL ENDEAVOR TO MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER(S) NAMED ON THIS CERTIFICATE, EXCEPT FOR NON-PAYMENT OF PREMIUM OR ANY OTHER CIRCUMSTANCE PERMITTED BY STATE LAW OR POLICY CONDITIONS. FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON US.

## SCHEDULE 2(g)(iv)

## EQUIPMENT LEASES AND PAYMENTS

See attached.



**NMHG Financial Services**
Its Successors & Assigns
44 Old Ridgbury Rd.
Danbury, CT 06810

Leased forklifts and scissor lift

$806.38

Exhibit 4.2(g)
Trademark Assignment

*See attached.*

# TRADEMARK ASSIGNMENT

**THIS TRADEMARK ASSIGNMENT** (this "Trademark Assignment") is made and entered into as of June ____, 2011, by and between **TRANSPECOS FOODS, LP**, a Texas limited partnership ("Assignor"), and _____ ("Assignee"). All capitalized words and terms used in this Trademark Assignment and not defined herein shall have the respective meanings ascribed to them in the Purchase Agreement (defined below).

## RECITALS

**WHEREAS**, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of June 9, 2011 (the "Purchase Agreement"), pursuant to which Assignee has purchased certain Assets from Assignor; and

**WHEREAS**, pursuant to the Purchase Agreement and as contemplated in Section 4.2(g) therein, Assignor has agreed to assign, and Assignee has agreed to accept, such Assets, including, without limitation, the trademarks, service marks and trade names of Assignor.

**NOW, THEREFORE**, Assignor, for and in exchange for the payment of the Purchase Price set forth in the Purchase Agreement, the receipt of which is hereby acknowledged, does hereby transfer and assign to Assignee, and Assignee hereby accepts the transfer and assignment of, all of Assignor's worldwide right, title and interest in, to and under the Marks, together with the goodwill of the business associated therewith and which is symbolized thereby, all rights to sue for infringement of any Mark, whether arising prior to or subsequent to the date of this Trademark Assignment, and any and all renewals and extensions thereof that may hereafter be secured under the laws now or hereafter in effect in the United States and in any other jurisdiction, the same to be held and enjoyed by Assignee, its successors and assigns from and after the date hereof as fully and entirely as the same would have been held and enjoyed by Assignor prior to this Trademark Assignment. The Marks transferred by this Trademark Assignment include, but are not limited to, those Marks listed on Schedule A attached hereto.

Except to the extent that federal law preempts state law with respect to the matters covered hereby, this Trademark Assignment shall be governed by and construed in accordance with the laws of the State of Texas without giving effect to the principles of conflicts of laws thereof.

**[Signature Pages Follow]**

**IN WITNESS WHEREOF**, Assignor has caused its duly authorized officer to execute this Trademark Assignment as of the date first above written.

**ASSIGNOR:**

**TRANSPECOS FOODS, LP**

By:   TPF GP, LLC, its General Partner

By:

_____
Gary Candy, Manager

STATE OF
COUNTY OF KENDALL

Before me, _____, a Notary Public in and for the State and County aforesaid, personally appeared Gary Candy, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself to be the Manager of TPF GP, LLC, the General Partner of TRANSPECOS FOODS, LP and being duly authorized so to do, executed this Trademark Assignment on behalf of TRANSPECOS FOODS, LP.

WITNESS my hand and seal at office, on this the _____ day of _____, 2011.

_____
Notary Public

My Commission Expires:

_____

**IN WITNESS WHEREOF**, Assignee has caused its duly authorized officer to execute this Trademark Assignment as of the date first above written.

**ASSIGNEE:**

_____

By: _____

Name: _____

Title: _____

1. <u>TransPecos Foods</u> – IC 029. US 046. G & S: Appetizers; namely, breaded mozzarella cheese sticks, stuffed jalapenos, corn nuggets, broccoli and cheese bites, onion rings, onion and pepper slivers, processed breaded or battered mushrooms, breaded zucchini and battered okra. FIRST USE: 20020429. FIRST USE IN COMMERCE: 20020429; IC 030. US 046. G & S: Corn fritters; apple fritters; IC 031. US 001 046. G & S: Raw onion and pepper slivers.

2. <u>Pecos Valley Farms</u> – IC 029. US 046. G & S: breaded, partially fried, partly prepared, prepared, ready-to-eat and frozen onion rings and other vegetables. FIRST USE: 20050203. FIRST USE IN COMMERCE: 20050203.


**Post-registration filing of affidavits of use and incontestability and renewal applications for Pecos Valley Farms mark have not yet been filed; the filing period began on May 9, 2011.**